[Sac. No. 4869. In Bank.—February 28, 1935.]

D. W. PARK et al., Respondents, v. SABRA E. POWERS et al., Appellants.

John G. Jury for Appellants.

Geo. L. Sanford, Henry S. Lyon and Homer Mooney for Respondents.

SEAWELL, J.—From a judgment quieting plaintiffs' title to lands in El Dorado County, defendants Sabra E. Powers and Katherine S. Hill prosecute separate appeals. Said land is situate on the shore of Lake Tahoe, and is a portion of lot 2, in the northwest quarter of section 27, township 13 north, range 18 east, Mount Diablo base and meridian. It comprises approximately the southeast quarter of the northwest quarter of section 27. Said northwest quarter of section 27 has no southwest or northwest quarter, but the southeast quarter thereof, that is, lot 2, is bounded by Lake Tahoe. The present California-Nevada boundary line passes diagonally across lot 2 in a straight line from a point on the western line of the lot, near the northwest corner thereof, to the southeast corner, at or near the intersection of the midsection lines of section 27. This action involves that part of said lot 2 which is situate in this state. The lot contains approximately 42.25 acres, of which 16.64 are in California. In recent years it has become valuable for summer camp sites and residences.

Plaintiffs rely on title by adverse possession. Plaintiffs Conklin and Fuller are grantees of plaintiff D. W. Park as to 4.58 acres in lot 2 by deed executed in 1928. Defendant Katherine S. Hill is the surviving wife and executrix of

the estate of Arthur M. Hill. In 1911 members of the Park family conveyed to the Hills 3.45 acres, more or less, in lot 2, bounded by the south line of said lot. Appellant Hill contends that a fence placed upon lot 2 in 1910 and 1911 is in fact south of the northern line of the 3.45 acre grant and encroaches upon it. Defendant Sabra E. Powers claims record title to all of lot 2, but consents that title be quieted in appellant Hill as to said 3.45 acres, which the Hills acquired in good faith.

Appellant Sabra E. Powers prays that this court direct entry of a judgment quieting her title. Upon the record, there is a question as to whether she has established her record title to all of lot 2. In 1864, said lot and other lands in section 27 were patented to her husband, Phineas F. Powers, by the United States government. In 1931 said lot was set aside to appellant by decree in her husband's estate. However, on October 5, 1869, she and her husband joined in conveying lands in section 27 to Thomas O'Brien, who six days later, on October 11, 1869, executed a deed naming the husband as grantee. It is the theory of appellant, as stated in her briefs, that the deed of October 11th was a reconveyance to her husband of lands in lot 2 previously conveyed to O'Brien by the deed of October 5th, and that thereafter her husband continued to be the owner until his death.

Said deed of October 11th, through which appellant claims, contains no reference to lot 2, or indeed to any lands in the northwest quarter. It purports to convey the "south fraction of the south half of the northeast quarter and the northeast quarter of the southeast quarter of section 27". It does, however, describe the lands conveyed as bounded on the west by Lake Bigler (now Lake Tahoe), and as containing ninety acres, more or less, by reason of which recitals, appellant contends, it conveys an interest in lot 2 in the northwest quarter. Lands in the northeast and southeast quarter do not border on the lake. It would be indulging in great liberality to admit parol evidence of an intent to transfer lot 2 in the northwest quarter when the deed contains no reference thereto, and the description is not aided by words of ownership or user. We are not disposed at this time to analyze the law pertaining to construction of uncertain descriptions, for if it be conceded here, for

purposes of argument, that the deed may be explained as contended for and that upon the record an intent to transfer lot 2 is established, nevertheless appellant has lost title to said lot through adverse possession of plaintiffs.

On November 28, 1883, Phineas F. Powers conveyed to C. P. Powers lands in sections 27 and 23. The lands in section 27 are described as "the south fraction of the south half of the northeast quarter and the northeast quarter of the southeast quarter of section 27". This is precisely the description contained in the deed of 1869 from O'Brien to Powers, except that the deed of 1883 omits the recital that the land conveyed is bounded on the west by the lake, and that it contains ninety acres, more or less. In 1888, Wales Averill purchased lands in section 27 from the estate of C. P. Powers by the description contained in the 1883 deed, and also lands in section 23. In 1899 said lands, together with other lands, passed by deed from the Averill family to D. B. Park, father of plaintiff D. W. Park. On February 15, 1908, D. B. Park deeded to his wife and children. He died in the same year. In 1915 several conveyances were made between members of the Park family, all following the description of the 1883 and 1899 deeds, which did not include lot 2. Upon the death of Bruce Park, his brother D. W. Park was appointed administrator of his estate, and an undivided two-thirds interest in lands in section 27 and other lands was distributed to Unity Park, mother of Bruce Park, in 1922. She already claimed an undivided one-third interest under the family conveyances aforementioned. The description in the decree is by metes and bounds and includes lot 2. On October 25, 1924, Unity Park conveyed to D. W. Park land in section 27, including "lot 2 of section 27".

■ Since the deed of 1883 and later deeds with the same description did not include lot 2, they did not confer color of title on the grantees named, but adverse possession of said lot is governed by section 325, Code of Civil Procedure. Until 1923 the possession of the Park family lacked one of the essential elements to ripen into title by adverse possession—payment of taxes. As this action was not filed until January 21, 1931, adverse possession, including payment of taxes, dating from 1923, is sufficient to establish title in plaintiffs. However, the facts pertaining to the

prior occupation and possession are material, as the possession of plaintiff D. W. Park is a continuation of the occupation by other members of his family, and the character of his possession must be determined with reference to the circumstances under which the occupancy of his family began and was perpetuated. (*Akley* v. *Bassett,* 189 Cal. 625, 643 [209 Pac. 576].)

As noted above, lands in section 27 and a large acreage of other lands passed from the Averill family to D. B. Park by deed of May 31, 1899. The lands in section 27 were described as in the earlier deed of 1883, which did not include lot 2. Coincident with the delivery of the deed, the grantor delivered to Park a map entitled "Edgewood Ranch, Wales Averill". Said map, a photostatic copy of which was introduced herein, was shaded to delineate the Averill or Edgewood ranch. The land which constituted lot 2 of section 27, bordering on Lake Tahoe, is shaded as a part of said ranch. At that time a fence, made of brush and timber, inclosed the lands marked as Edgewood Ranch, and the grantor represented that the lands within said inclosure, which in fact included lot 2, were conveyed by the deed. Although section lines and midsection lines are drawn upon the map, there are no numbers or letters from which the designation of any particular quarter section can be ascertained, nor does the designation "Lot 2" appear.

In 1899 there was a house upon the ranch, not situate, however, on lot 2. The Averills moved out upon delivery of the deed to D. B. Park, and since then members of the Park family have been in possession continuously of the Edgewood, Lake or Averill ranch, claiming ownership thereof. It has been used each year for pasturage and grazing, for which land in the district was adapted and customarily used. With the exception of one or two wet years, it has been irrigated. The old brush and timber fence was repaired and rebuilt until 1910, or 1911, when it was replaced by a new fence with posts and wire. Where inclosed land suitable for grazing and pasturage is occupied each year during the full period of the season therefor, in the instant case from May until late October or November, possession is continuous within the meaning of the statute. (*Montgomery* v. *Quimby,* 164 Cal. 250 [128 Pac. 402]; 1 Cal. Jur. 533, and cases there cited.)

■ The only reasonable inference to be drawn from the evidence is that D. B. Park entered upon lot 2 under the mistaken impression that the deed to him for adjoining lands in fact transferred lot 2, and that he, and after him members of his family, claimed to own said lot. The fact that D. B. Park's entry was coincident with the deed of 1899 would not preclude him and thereafter members of his family from occupying adversely adjoining lands not embraced in the deed.

Title by adverse possession may be acquired through the possession or use commenced under mistake. (*Woodward* v. *Faris*, 109 Cal. 12 [41 Pac. 781]; *McCormack* v. *Silsby*, 82 Cal. 72 [22 Pac. 874]; *Wagner* v. *Meinzer*, 38 Cal. App. 670 [177 Pac. 293]; 1 Cal. Jur. 577; note, 80 A. L. R. 156.) In *Woodward* v. *Faris*, 109 Cal. 12, at page 17 [41 Pac. 781], Mr. Justice Temple said: "Most cases of adverse possession which have ripened into title commenced, I doubt not, in mistake. It must be either by mistake or deliberate wrong. It is through mistake only that one can honestly claim to own that which really belongs to another." Appellant Powers rests her claim of legal title to at least a part of lot 2 on the premise that it was the intention of Powers and O'Brien that it should be transferred by the O'Brien-Powers deed of October 11, 1869. If they believed that land bounded by the lake and including lot 2 was correctly described as "the south fraction of the south half of the northeast quarter and the northeast quarter of the southeast quarter of section 27", it is a likely inference, especially in view of the fact that said lot, so far as the evidence shows, was never occupied except as part of the larger tract, that when the same description was used in the deed of 1883 by Powers, and by later grantors, without the recital that the property was bounded by the lake and contained 90 acres, more or less, that all concerned, including appellant Sabra E. Powers, believed that an interest in lot 2 was thereby conveyed. Although her husband died in 1910, appellant Powers did not procure lot 2 to be set aside to her until 1931.

■ In the circumstances the failure of the Parks to pay taxes before 1923 does not demonstrate that they did not occupy under claim of title, but is consistent with a belief that the lands described in the deed of 1899, upon which

they no doubt paid taxes, included the physical property, which in fact, although unknown to them, was correctly described as lot 2. Some uncertainty may also have arisen by reason of the location of the land with reference to the state line. The present line was adopted by California in 1901, and by Nevada in 1903. The earlier boundary ran south of the land in question. The failure to record the inter-family Park deeds of 1908 and 1915 may also have been due to uncertainty as to the location upon the ground, and with reference to the Edgewood ranch, of the state line. The larger part of lot 2, and of said ranch, is in Nevada.

█ The conveyance of 3.45 acres to the Hills in 1911 and the building of the new fence about that time were also the exercise of dominion over lot 2. Although this conveyance was not recorded until 1928, evidence thereof was admissible, it appearing that the possession was otherwise open and notorious.

We have discussed at some length the occupancy of the Park family prior to the payment of taxes in 1923 because the circumstances of D. W. Park's occupation must be viewed in the light of the prior possession. After the deed to him occupancy continued as before, and was accompanied by payment of taxes. In 1928 he granted 4.58 acres to plaintiffs Conklin and Fuller, and in 1930 he procured a decree in Nevada quieting his title as to the section of the lot in Nevada.

█ But appellant Powers contends that because lot 2 was described by metes and bounds in the estate of Bruce Park, of which plaintiff was administrator, and as lot 2 of section 27 in the deed to him in 1924, it conclusively appears that he had discovered the omission in the earlier description, and knew that he did not have title. Considerable confusion appears to have arisen as to whether good faith, in the sense of a belief in ownership, is essential to acquire title by adverse possession. The decisions of this state are to the effect that one who claims *constructive* adverse possession of land not actually occupied, but part of a larger tract described in an instrument of title, a part of which has been occupied, must in good faith rely on said instrument. (See discussion and citations, 1 Cal. Jur. 575.) But many text-writers declare that as to *actual* adverse possession, *bona fides,* in the sense of belief in ownership, is not a requisite;

that "claim of title", or right is a claim by the occupant to appropriate, an intention to hold for himself. (1 R. C. L. 709; 2 C. J. 199; Sedgwick and Wait, Trial of Title to Land, pp. 614–619; 2 Tiffany, Real Property, p. 1936, sec. 504; 7 Cal. Law Rev. 200.) We will not here resolve any confusion existing in this state for the reason that the changes in description do not indicate a lack of *bona fides*. Park may, nevertheless, have believed that by virtue of the long occupation of his family, the uncertainty as to the record title under the description in the O'Brien-Powers deed, and the probability, mentioned before, that Phineas F. Powers and later grantors all intended that lot 2 should be transferred, that in fact he had acquired a good title, although not, perhaps, record title. Good faith is consistent with an ignorance of rules of property law. (*Wilson* v. *Atkinson,* 77 Cal. 485 [20 Pac. 66, 11 Am. St. Rep. 299].)

The possession of the Parks was not deprived of its adverse character because neither they nor any agent for them ever resided or lived upon lot 2. There was a house upon the ranch, which was located on the Nevada side. Members of the Park family lived in this house during part of the time, but their family home and legal residence was located about twelve miles distant, in Nevada. The adverse claimant need not reside upon the land. (*Webber* v. *Clarke,* 74 Cal. 11 [15 Pac. 431]; 1 Cal. Jur. 529; 2 C. J. 57.) Under section 412, Code of Civil Procedure, the owner of land may have substituted service by publication and mailing upon a nonresident adverse claimant. Actions relating to land, such as suits to quiet title, are denominated *quasi-in-rem.* Their distinguishing characteristic is that although not strictly *in rem,* since judgments therein are not binding upon the world, but conclusive only between the parties and their privies, they differ from actions purely *in personam* in that jurisdiction against a nonresident and absent defendant may be had upon constructive service. (*Perkins* v. *Wakeham,* 86 Cal. 580 [25 Pac. 51, 21 Am. St. Rep. 67]; *First Nat. Bank* v. *Eastman,* 144 Cal. 487 [77 Pac. 1043, 103 Am. St. Rep. 95, 1 Ann. Cas. 626]; *McDonald* v. *McCoy,* 121 Cal. 55, 69 [53 Pac. 421]; *Title etc. Restoration Co.* v. *Kerrigan,* 150 Cal. 289 [88 Pac. 356, 119 Am. St. Rep. 199, 8 L. R. A. (N. S.) 682]; note, 51 A. L. R. 754; 1 Freeman on Judgments, p. 705; 3 Freeman on Judgments,

p. 3122; 22 Cal. Jur. 139; 21 Cal. Jur. 497–500.) In actions to quiet title the plaintiff may be put into possession through writ of possession. (22 Cal. Jur. 129, 194.) In *Akley* v. *Bassett,* 189 Cal. 625, 645 [209 Pac. 576], it is expressly held that by virtue of provisions for substituted service, title by prescription may be acquired by a nonresident claimant of land.

The separate appeal of Katherine S. Hill presents the question whether the fence built in 1910 and 1911 constituted the northern boundary of the 3.45 acre triangular tract in the southern part of lot 2 which was conveyed to the Hills in 1911. In exchange for this parcel the Hills conveyed to the Parks a triangular piece of about the same area in the northern part of the southeast quarter of section 27. One Hawkins was employed in 1910 to survey the parcels to be transferred, furnish a description, and mark the line of the boundary fence to be built. Park and Hill both participated in the negotiations with the surveyor. The fence was built along the line marked by the surveyor with flags, which is slightly to the south of the line called for by the deeds. The Park deed to the Hills is dated August 10, 1911, the Hill deed, March 21, 1913. It may well be that neither deed was prepared until after the fence had been placed along the line agreed upon by the parties as a boundary. That the fence constituted an established boundary is fully supported by the following cases: *Moniz* v. *Peterman,* 220 Cal. 429 [31 Pac. (2d) 353]; *Vowinckel* v. *N. Clark & Sons,* 217 Cal. 258 [18 Pac. (2d) 58]; *Nusbickel* v. *Stevens,* 187 Cal. 15 [200 Pac. 651]; *Silva* v. *Azevedo,* 178 Cal. 495 [173 Pac. 929]; see, also, Wiel, Built-up Boundaries, 4 Cal. Law Rev., p. 293. This line was acquiesced in for almost twenty years. The establishment of a boundary marked by the fence is not prevented because both parties intended that the fence line and boundary fixed by the deeds should conform, and believed that the fence was upon the line fixed by the deed, nor by the circumstance that the line of the deeds could be determined by a survey. (Cases cited, *supra,* this paragraph.)

The judgment is affirmed.

Thompson, J., Waste, C. J., Shenk, J., and Curtis, J., concurred.