[L. A. No. 18365. In Bank. Mar. 29, 1944.]

KATE H. HANNAH, Plaintiff and Respondent, v. J. W. C. POGUE et al., Appellants; THE REGENTS OF THE UNIVERSITY OF CALIFORNIA (a Corporation), Cross-Defendant and Respondent.

KATE H. HANNAH, Respondent, v. J. W. C. POGUE et al., Appellants. (Two Cases.)

850

McFadzean & Crowe for Appellants.

Conley, Conley & Conley, W. M. Conley, Philip Conley, Mathew Conley and Calkins, Hall, Linforth & Conard for Respondents.

TRAYNOR, J.—Plaintiff Mrs. Kate H. Hannah is the owner of approximately a section of land in Tulare County subject to a $50,000 mortgage held by the Regents of the University of California. Through it runs the Kaweah River, from which defendant Harley Smith has for many years diverted water by means of a dam located on plaintiff's land and a ditch known as the Hamilton Ditch, which also runs through plaintiff's property. The Hamilton Ditch has been

in use since about 1860, and the trial court found that the dam has been in use for over twenty years. The dam in existence before 1920 was built of rock, but in that year it was replaced by a cement dam on the same site. By 1925 the latter had sunk into the sand of the river bed and was replaced by another cement dam on the same site. In 1928 and 1929 defendant J. W. C. Pogue purchased the land served by the ditch and entered into a contract to purchase the ditch and its appurtenances.

In 1936 the river washed round the north end of the dam. Defendant Pogue then entered plaintiff's land and repaired the dam with dirt and branches from the surrounding area. Plaintiff brought suit and obtained a temporary order restraining defendant from entering plaintiff's property. After defendant agreed to take no more materials from plaintiff's property, the injunction was modified by stipulation to permit defendant to enter and repair the dam. Defendant thereafter filed a cross-complaint in this proceeding, asking that plaintiff be enjoined from interfering with certain rights of way to the dam over plaintiff's land. The University of California was joined as cross-defendant to this cross-complaint.

Early in 1937 the Kaweah River again washed round the north end of the dam, doubling the width of the channel and depositing a large sand bar in front of the ditch. Early in 1938 the river widened the channel still more. Through 1937 defendant Pogue made no attempt to extend the dam to the opposite bank of the river, but obtained water by cutting the ditch through the sand bar to the river and by pumping water into the ditch. In 1938 he constructed a new dam of rock some distance upstream from the old cement dam. The old dam was placed squarely across the river, its wall perpendicular to the banks, so that it forced water into the ditch by impounding it at a level higher than the bottom of the ditch. The new rock dam was placed at an acute angle across the river, so that the end that touched the bank opposite the mouth of the ditch was farther upstream than the end nearest the mouth. The current of the river was thus directed into the ditch, which had been extended upstream to the site of the new dam. The downstream end of the new dam was about 185 feet upstream from the south end of the old cement dam; the upstream end was about 950 feet above the point

where the old dam would have touched the bank of the river had it been extended that far.

On June 19, 1939, plaintiff brought suit to enjoin the maintenance of the new dam and the channel running thereto from the Hamilton Ditch. A quiet title suit was also pending between plaintiff and defendant to settle a controversy over the ownership of land arising out of the erosion caused by the river's washing round the northern end of the dam. The eroded land is near the boundary between section 7, largely owned by plaintiff, and section 8, at least the eastern part of which is being purchased by defendant Pogue. There is an old fence running from north to south in this neighborhood of the disputed boundary. The monument that once marked the north corner of these sections no longer exists and surveyors differed in their testimony as to where it had probably been located.

On August 21, 1939, plaintiff brought suit to quiet title to the disputed triangle of land along the boundary. On August 19, 1939, plaintiff brought suit to enjoin the maintenance of certain levees by defendant Pogue. These suits, together with the original action by plaintiff against defendant Pogue to enjoin defendant from entering plaintiff's lands, and defendant's cross-complaint in that action, were joined for trial. They were tried by the court, findings of fact and conclusions of law were made and judgment was entered. Defendants Pogue and Smith were enjoined from entering plaintiff's land except over designated rights of way; plaintiff was enjoined from interfering with those easements; defendants were required to remove the new dam and to fill in the ditch running from the dam to the former mouth of the Hamilton Ditch. Defendants were enjoined from maintaining any dam, except on the site of the concrete dam as extended to the opposite shore, and from maintaining a ditch on plaintiff's land except along the line where the Hamilton Ditch had run, meeting the Kaweah River about 20 to 30 feet above the concrete dam. In the quiet title action the court determined that the boundary followed the old fence, thus establishing that the erosion at the north end of the rock dam was on plaintiff's land. While defendants object to the location at which the trial court placed a right of way for them to the dam on the north side of the river, the trial court granted a new trial as to this issue, so that it is not now

before the court. As to the location of the other rights of way, there is no objection by either party. Defendants appeal from the judgments set forth above. Plaintiff takes no appeal from these judgments or from the judgment denying her an injunction against the maintenance of the levees mentioned above.

The principal dispute between plaintiff and defendants concerns the defendants' claim of a right to change the site of the dam and ditch. Defendants contend that the scope of their easement has been too narrowly determined, and that the construction of the new dam upstream and of a connecting channel was within the scope of their right to repair and improve their easement. It must be assumed that their easement is based on prescription, for the proof was not that the right was granted, but that these facilities had been maintained for the prescriptive period. ■ The scope of a prescriptive easement is determined by the use through which it is acquired. A person using the land of another for the prescriptive period may acquire the right to continue such use, but does not acquire the right to make other uses of it. (*Vestal* v. *Young,* 147 Cal. 715 [82 P. 381]; *North Fork Water Co.* v. *Edwards,* 121 Cal. 662 [54 P. 69]; *Oliver* v. *Agasse,* 132 Cal. 297 [64 P. 401]; *Allen* v. *San Jose Land & W. Co.,* 92 Cal. 138 [28 P. 215, 15 L.R.A. 93]; *Pacific Gas & E. Co.* v. *Crockett L. & C. Co.,* 70 Cal.App. 283 [233 P. 370]; *Felsenthal* v. *Warring,* 40 Cal.App. 119 [180 P. 67]; see *White Bros. & Crum Co.* v. *Watson,* 64 Wash. 666 [117 P. 497, 44 L.R.A.N.S. 254]; 3 Tiffany, Real Property [3d ed.] 334; 28 C.J.S. 763.) ■ Likewise if an easement is acquired by grant in a given location in the servient tenement, it becomes fixed by use and its location may not be substantially changed. (*Kern Island Irrigating Co.* v. *City of Bakersfield,* 151 Cal. 403 [90 P. 1052]; *Felsenthal* v. *Warring, supra; Evangelical etc. Home* v. *Buffalo Hydraulic Assoc.,* 64 N.Y. 561; see *Ward* v. *City of Monrovia,* 16 Cal. 2d 815 [108 P.2d 425].) Thus, in *Vestal* v. *Young, supra,* and in *Felsenthal* v. *Warring, supra,* it was held that a person having the right to maintain a ditch in the land of another cannot substantially change the route of the ditch. (See, also, *Kern Island Irrigating Co.* v. *Bakersfield, supra.*) In the Evangelical Home case, *supra,* it was held that a person having the right to maintain a dam cannot change its loca-

tion, and in *White Bros. & Crum Company* v. *Watson, supra,* it was held that a person with a right to divert water through a ditch in the land of another has no right to replace the ditch with a dam and a flume elsewhere on the land, even though changes in the natural conditions make effective diversion impossible except by such means.

Defendants have not shown that they or their predecessors in interest ever maintained a dam and ditch in locations other than those occupied by the old concrete dam and the ditch. They have thus shown no right by prescription or otherwise to make any use of the remainder of plaintiff's land, and the trial court properly restricted them to the site previously occupied. Otherwise they would have had a floating easement enabling them to maintain a dam wherever they chose along the length of the river on plaintiff's land, preventing plaintiff from selling any of the land bordering on the river free of the easement. Defendants contend that the new dam constitutes no greater burden than the previous one.

There is no right, however, to change the location of an easement over the land of another, even if it would cause no harm to the owner or would actually benefit him. (*Vestal* v. *Young, supra,* at 719; see *Allen* v. *San Jose Land & W. Co., supra,* at 141.)

Defendants contend that the extension to the Hamilton Ditch is permissible on the ground that it is placed in the channel of the river. The evidence shows that it was excavated in dry land on plaintiff's property, and it is immaterial whether that land be regarded as the dry bed of the river or the dry bank, for under the principles set forth above defendants may not thus appropriate plaintiff's property. Defendants rely on the early case of *Ware* v. *Walker,* 70 Cal. 591 [12 P. 475]. In that case a gravel bar in the bed of an arroyo built up by freshets prevented the water therein from reaching the head of Ware's ditch. It was held that Ware had the right to remove obstructions to the flow of the stream and did not exceed his right when he cut a channel through the bar and constructed a wing dam to divert water into the channel. Defendants, however, are not seeking to cut through the bar built in front of the old head of their ditch, a right that has never been denied them, but to replace the dam they once maintained with a new dam working on different principles, at a different site, and to

connect that dam with their ditch by maintaining a 187-foot channel on plaintiff's land behind and paralleling the sand bar. Nothing in the Ware case authorizes such alterations in established easements.

It is contended that the decree preventing defendants from constructing a dam except at the former site makes it impossible for them to construct any dam, for they are authorized only to build a dam to the shore but not to tie it into the shore. The judgment allowing them to build the dam, however, should be construed to allow them to do whatever is necessary to such construction, including the right to tie the dam into the shore. It is also contended that since the judgment authorizes construction of a dam from the old site to the north shore, it does not authorize extensions in case the river works its way round the south shore of the dam. The language in question, however, appears to anticipate the possibility that a dam on the old site, no longer than the old dam, would touch the south shore but not the north. This language establishes that defendants still have the right, frequently exercised in the past, to extend the dam so far as is necessary to meet the north shore. It should not be construed as denying a comparable right if the south shore receded.

Defendants appeal also from the judgment that the boundary between plaintiff's land and defendants' land is the old fence. The trial court found that about the year 1917 the owners of these lands agreed that the fence should be the boundary. Defendants contend that there is no evidence of such an agreement, and that in any event it could not be given effect unless the boundary were uncertain, or disputed. It is the rule, however, that the court may infer that there was such an agreement ensuing from uncertainty or a dispute, from the long-standing acceptance of a fence as a boundary between the lands of two owners. (*Roberts* v. *Brae,* 5 Cal.2d 356 [54 P.2d 698]; *Vowinckel* v. *N. Clark & Sons,* 217 Cal. 258 [18 P.2d 58]; *Moniz* v. *Peterman,* 220 Cal. 429 [31 P.2d 353]; *Board of Trustees* v. *Miller,* 54 Cal. App. 102 [201 P. 952]; *Todd* v. *Wallace,* 25 Cal.App.2d 459 [77 P.2d 877]; *Perich* v. *Maurer,* 29 Cal.App. 293 [155 P. 471]; *Swartzbaugh* v. *Sargent,* 30 Cal.App.2d 467 [86 P.2d 895]; *Southern Counties Gas Co.* v. *Eden,* 118 Cal.App. 582 [5 P.2d 654]; *Raney* v. *Merritt,* 73 Cal.App. 244, 250 [238 P. 767]; see *Park* v. *Powers,* 2 Cal.2d 590, 599 [42 P.2d 75]; *Clapp* v. *Churchill,* 164 Cal. 741, 746 [130 P. 1061]; see 14 Cal.L.Rev. 138.)

Mrs. Hannah testified that the fence was in existence when her husband acquired the property, that it remained standing down to the time of the trial, and that she believed it marked the boundary until she learned that defendant Pogue had employed a surveyor to determine the boundary. This testimony establishes her acceptance of the fence as the boundary, in all likelihood reflecting the belief of her husband and former owners on the other side of the fence. She also testified that she knew of no agreement that the fence should constitute the boundary. This testimony does not necessarily rebut the inference that there was such an agreement, however, for the inference may be made that an agreement was inherent in the long-standing acceptance of the fence as the boundary. (*Roberts* v. *Brae, supra,* at 359; *Vowinckel* v. *N. Clark & Sons, supra,* at 260; *Moniz* v. *Peterson, supra,* at 435; *Board of Trustees* v. *Miller, supra,* at 105; *Southern Counties Gas Co.* v. *Eden,* 118 Cal.App. 582, 586 [5 P.2d 654]; see 14 Cal.L.Rev. 138.) The courts have recognized such boundaries because the early surveys in the state were most uncertain, and in later years the monuments and landmarks they described could not be found. (See Loeb, *The Establishment of Boundary Lines by Practical Location,* 4 Cal.L.Rev. 179.) In the present case the boundary lines could not be ascertained from the early surveys, for the monument determining the northern end of the boundary and most of the other landmarks cannot be found. Given the difficulties of fixing the boundaries anew according to the old surveys, the trial court properly recognized a line that has served for many years as the practical boundary.

The trial court decided that this boundary was settled by agreement in 1917, apparently because this year marked the acquisition of the property by the Hannahs and their acceptance of the fence as a boundary. It is unnecessary to decide whether on this evidence the agreement can be assigned to this particular date, for the precise date of agreement is immaterial in view of the acceptance of the fence as a boundary over a long period of years.

Defendants contend that the description in the judgment of the location of the fence lacks definiteness. Part of the section was surveyed by the federal government, but part was swamp and overflowed land first surveyed by the county surveyor after the land was granted by the federal

government to the state. The federal survey defined the eastern boundary from its southern end to the point where it met the swamp and overflowed area; the county survey defined the rest of the boundary. The boundary from that point northerly to the intersection of the fence with the northern line of the section was regarded as marked by the fence. The monument described as marking the point where the fence met the edge of the swamp and overflowed area was a 2″ by 2″ stake and iron pin which the deputy county surveyor testified he removed before judgment. Since the judgment ties the fence as the boundary line to the stake and pin as established before removal, it must be reversed with directions to re-establish the stake and pin so that the boundary line may be made certain.

The third judgment from which defendants appeal fixes the locations of defendants' easements. Defendants were enjoined from entering plaintiff's property except by route of designated easements, and from taking dirt or branches from plaintiff's land. The latter part of the judgment violates the rule that an injunction is ordered against past acts only if there is evidence that they will probably recur. (*Ball* v. *Kehl,* 87 Cal. 505 [25 P. 679]; *Blackmore Inv. Co.* v. *Johnson,* 213 Cal. 148 [1 P.2d 978]; *Thome* v. *Honcut Dredging Co.,* 43 Cal.App.2d 737 [111 P.2d 368]; see 32 C.J. 46; cases collected 14 Cal.Jur. 209.) There was evidence that on two occasions defendant Pogue took dirt and branches. There was no evidence that he intended to continue doing so.

Defendant Smith was improperly enjoined from entering plaintiff's land, for there was no evidence that he had ever entered without plaintiff's consent, or that he intended to do so. While he claimed the right on the pleadings to enter at points other than those that the court later designated in locating his easement, such a claim should be determined by declaratory relief rather than by injunction. This judgment is therefore reversed insofar as it enjoins defendants from taking dirt and branches and enjoins defendant Smith from entering, with directions to declare that Smith has the right to enter only over the easements that it declares to be on the north and south sides of the river. In other respects this judgment is affirmed.

Defendant Pogue contends that the trial court erred

in refusing him damages for the obstruction of his rights of way. The trial court found that plaintiff had wrongfully obstructed his easement, to his loss, but was unable to determine the amount of damage. The only testimony regarding that issue was that of defendant Pogue, limited to the general statement that he was convinced the cost of his operations had been increased about one-third. The total cost of repairing and maintaining the dam was about $8,500. In contending that Pogue's testimony should be admitted, his attorney stated that this figure was an estimate, and that it was impossible to show the loss of any specific amount on any specific occasion. There was no other evidence of damage, and the trial court was justified in regarding this testimony as unreliable in view of the interest of the witness. (*Caldwell* v. *Weiner*, 203 Cal. 543 [264 P. 1110]; *Davis* v. *Judson*, 159 Cal. 121, 128 [113 P. 147]; *Blanc* v. *Connor*, 167 Cal. 719, 723 [141 P. 217]; *Lejeune* v. *General Petroleum Corp.*, 128 Cal.App. 404 [18 P.2d 429].)

The judgments are affirmed in part and reversed in part as set forth above, with costs to be borne by appellant.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Carter, J., and Schauer, J., concurred.

Appellants' petition for a rehearing was denied April 27, 1944.