[Civ. No. 21781. Second Dist., Div. One. Dec. 4, 1956.]

LEWIS A. WINCHELL et al., Respondents, v. ALBERT L.
LAMBERT et al., Appellants.

Robert B. Heggen for Appellants.

Frye & Yudelson and Collman E. Yudelson for Respondents.

WHITE, P. J.—Defendants have appealed from a judgment quieting plaintiffs' title to portions of Lot A and Lot 204. The following is a summary of the uncontroverted evidence. Appellants are the owners of Lot 285, which is in the shape of a triangle, on the west 115.43 feet along the street, on the south 115.73 feet at right angles to the street, and on the northeast the hypotenuse 163.46 feet along the southwest line of respondents' Lot A. Said Lot A extends beyond both the north and the southeast extremities of Lot 285.

Since 1938 appellants have lived in the house on Lot 285.

Two triangular portions of the house encroach upon respondents' Lot A. About 9 feet of unobstructed boundary line is between the two encroachments. In 1941, appellants added at the end of their house a lanai 21.80 feet by 22.95 feet, with a cement floor, wooden louvre fence, and a partial covering of widely spaced boards. Most of the lanai is on respondents' Lot A. A portion of it extends across the entire width of said Lot A and encroaches on respondents' Lot 204 also. Appellants also planted and cared for grass, trees and shrubs on a portion of respondents' said lots. Except for appellants' buildings and landscaping, said Lots A and 204 are vacant and unimproved.

One of the grounds urged by appellants for reversal of the judgment is that respondents did not meet the burden upon them to prove title to said Lots A and 204. ■ In a quiet title action the plaintiff must prove his title in order to recover. (*Pacific States Sav. & Loan Co.* v. *Warden,* 18 Cal.2d 757, 759 [117 P.2d 877].)

Respondents' exhibits include: (1) a map of Tract 7578, recorded January 9, 1924, which shows Lot 285 and Lot A as a part of said tract; and (2) a map of the survey of appellants' improvements upon Lots 285, A and 204.

The evidence also includes a grant deed of Lot A and a portion of Lot 204 to respondents from S. August and Rae I. English and Harold A. and Mary M. Rood, dated August 27, 1952; a grant deed of the same property to English and Rood, dated August 19, 1952, executed by Publix Title Company, a California corporation; a quitclaim deed of a portion of Lot 204 from Leo and Leatrice Goodman to Publix Title Company, dated August 16, 1952; a quitclaim deed to Goodman of the portion of Lot 204 from Los Angeles County Flood Control District dated May 27, 1952; a quitclaim deed of the portion of Lot 204 to Los Angeles County Flood Control District from Eleanor Town Opid and Lois Miriam Town Hobson, dated March 15, 1924; and a quitclaim deed of a portion of Lot A to Publix Title Company, dated August 5, 1952, executed by the Los Angeles County Flood Control District.

In addition to the documents above listed, also in evidence are: (1) an "easement" dated September 4, 1923, between I. C. Ijams, W. F. Ijams, Isaac E. Ijams and Marguerita Ijams, as first parties, and Los Angeles County Flood Control District, as second party, for the purpose of establishing an official channel to carry the water of Tujunga Wash in a

single definite course. Said easement is given over a portion of Lot 2 all of Lots 1 and 3, and the northeasterly 50 feet of Lots 4 and 5 of the Ijams Tract; and (2) a quitclaim deed dated December 4, 1931, from Isaac E. Ijams to Los Angeles County Flood Control District of property "which I received from the Los Angeles County Flood Control District under the quitclaim deed dated August 18, 1930", which property is described as portions of Lots 1, 2 and 3 of the Ijams Tract.

■ The grant deed first above listed is prima facie evidence of respondents' ownership of Lot 204 and Lot A from and after August 1952. (Civ. Code § 1105; *Wilson* v. *Nichols,* 39 Cal.App.2d 527, 532 [103 P.2d 1007]; *Overton* v. *Harband,* 6 Cal.App.2d 455, 460 [44 P.2d 484]; Code Civ. Proc., §§ 1951, 1920, 1948.) Appellants contend that the uncontroverted pleadings and evidence of appellants' possession and use of said property continuously from 1941 to the commencement of the action in November 1954 nullifies respondents' said prima facie showing of ownership. On the other hand, respondents urge that appellants' occupancy of Lots A and 204 could not begin to ripen into title by adverse possession until 1952, when the Los Angeles County Flood Control District made its quitclaim deeds to those lots to respondents' predecessors, for the reason that until 1952 said lots were public property. Section 1007 of the Civil Code provides that " . . . no possession . . . of any land . . . owned by any . . . irrigation district . . . shall ever ripen into any title . . . "

The court found that the portions of Lots A and 204 here in question were held in fee by the Los Angeles County Flood Control District from 1931 to 1952 and that respondents acquired the fee simple title thereto in the year 1952. ■ The evidence of the District's title being entirely documentary and without conflict, it is a question of law which must be reviewed on this appeal. (*Moffatt* v. *Tight,* 44 Cal.App.2d 643, 648 [112 P.2d 910]; *Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Moore* v. *Wood,* 26 Cal.2d 621, 630 [160 P.2d 772]; *Meyer* v. *State Board of Equalization,* 42 Cal.2d 376, 381 [267 P.2d 257].)

In respondents' brief they contend that the evidence supports the finding that the District owned the fee title. As to Lot 204, they rely upon the quitclaim deed from Eleanor Town Opid and Lois Town Hobson to the Los Angeles County Flood Control District in 1924 and the District's quitclaim deed to appellants' predecessor in 1952. ■ From proof of the quitclaim deed to the Flood Control District in 1924,

it is presumed that whatever interest was conveyed to the District remained in it until it is shown to have been transferred by it to others in 1952. (Code Civ. Proc., § 1963, subd. 32.) Respondents refer us to nothing whatever in the record, and we find nothing therein, from which it can be presumed or inferred that either the Flood Control District or its grantors ever owned the fee simple title to Lot 204. The quitclaim deeds executed by them do not purport to grant a fee title or any other definite interest. ▆ A quitclaim is not necessarily or even usually a *"grant* of real property". Therefore, section 1105 of the Civil Code authorizes no presumption that a fee simple title was conveyed either to or by the District.

As to Lot A, respondents rely upon the easement granted to the Flood Control District by the several Ijams on September 4, 1923, together with the quitclaim deed of Isaac E. Ijams dated December 4, 1931. Respondents, in their brief, state: "Prior to 1931 the then owners thereof granted an easement to the Los Angeles County Flood Control District . . . In 1931 this easement ripened into fee title when the grantors of the easement joined in and delivered a quitclaim deed to the District . . . Thereafter Lot A remained in public ownership until conveyed by the Flood Control District in 1952 and plaintiffs became the eventual owners in August 1952 . . . "

The quitclaim in 1931 from the Ijams to the District, and its quitclaim of Lot A in 1952 to Publix Title Company do not support the finding that the District owned Lot A *in fee* from 1931 to 1952 for the same reasons hereinbefore set out with reference to the quitclaim deeds of Lot 204.

In addition to those quitclaims of Lot A, there are also in the record certificates of semi-annual payments of taxes thereon for the years 1948 to 1952, both included, assessed to General Title Clearing Company.

While the assessment and payment of taxes is not conclusive evidence of ownership, and either party could have produced evidence to explain or contradict the certificates, they are the only evidence in the record from which the ownership of Lot A during the years prior to 1952 may be inferred. ▆ The courts take judicial knowledge of the fact that land which is owned in fee simple by the Los Angeles County Flood Control District is not taxed. ▆ Therefore, the certificates of the deputy assessor that taxes on Lot A were assessed to and paid by General Title Clearing Com-

pany each April and December from December 1948 to December 1952, not having been contradicted or explained in any way, negative the finding that Lot A was owned in fee by the District during those years.

The record does not support the finding of public ownership during any part of the period required to complete title by adverse possession.

Respondents, in their brief, state that: "The uncontroverted testimony of the Defendant, Mr. Lambert, was that he never at any time intended to deprive anyone of anything and that he placed improvements upon property that he thought was his lot. Such an honest mistake has never been the basis of adverse possession and is not sufficient to establish title thereby." No authority for that statement is given. The testimony referred to is as follows:

"The Witness: It was our intention to claim the land as our own. We thought our land ran to the Flood Control fence.

"Q. When did you know that you were encroaching? A. When our surveyor completed the survey.

"Q. That was in May of this year? A. This year.

"Q. Had you at any time from 1938 to the present date entered into an agreement with anyone with reference to occupancy of Lot A, that portion that we have been discussing? A. No, we didn't.

"Q. And has your intention with reference to the occupancy of it varied at any time since 1938 to the present date? A. No, it hasn't."

On cross-examination the witness was asked:

"Q. I am going to ask you, Mr. Lambert, isn't it a fact that you never at any time ever intended to take any part of Lot A or Lot 204 if it didn't actually belong to you? A. No.

"The Court: That is not true? I often get confused by the double negatives.

"Mr. Yudelson: Let me reframe the question. I may have confused the witness by it.

"Q. Did you ever at any time actually intend to take any part of Lot A or Lot 204, if you had discovered it did not belong to you? A. No, I would not have."

On redirect examination the witness testified:

"Q. Mr. Lambert, what was your intention with building up to that line where the fence was? . . . A. I just thought that our property ran to the Flood Control Fence.

"Q. Did you claim it as your own or not? A. Yes."

The court found that subsequent to the purchase of Lot 285 by defendants in 1938, "there was constructed on said lot 285 a single family dwelling, the two northernmost corners of which extend over and upon and encroach upon Lot A, one corner projecting into Lot A a distance of 3.75 feet by 3.25 feet, the other extending into Lot A a distance of 8.70 feet by 8.60 feet; that in addition defendants did cultivate a portion of Lot A by planting grass and flowers and did extend a wooden fence across the front of said Lot A; that the said wooden fence, the cultivation, and the portions of the family dwelling of defendants daily and continuously did encroach upon and extend into plaintiffs' land and beyond the true and correct northerly boundary line of defendants' property.

"That the encroachment . . . at no time was intentional or willful, but was completely unintentional and arose through a unilateral mistake of facts by defendants as to the true boundary of defendants' land; and that defendants at all times intended only to erect buildings upon their own land and upon no other."

The court then found untrue each and every allegation of each of defendants' affirmative defenses, including those denominated "counterclaim."

"The findings of fact must be liberally construed to support the judgment (*Woodbine* v. *Van Horn*, 29 Cal.2d 95 [173 P.2d 17]; 2 Cal.Jur. 871-872), and this court has power where a jury trial is not a matter of right or has been waived to correct and amend findings where conflicting as the result of inadvertence in order to affirm the judgment." (*Johndrow* v. *Thomas*, 31 Cal.2d 202, 207 [187 P.2d 681], and cases there cited.) But, where general findings conflict with specific findings as in the instant action, the specific findings control. (*Staub* v. *Muller*, 7 Cal.2d 221, 226 [60 P.2d 283]; *Garten* v. *Garten*, 140 Cal.App.2d 489, 495 [295 P.2d 23].)

Since appellants' deed of Lot 285, according to the map of subdivision 7578, did not cover any portion of Lot A or Lot 204, appellants' adverse possession is governed by sections 324 and 325 of the Code of Civil Procedure. (*Park* v. *Powers*, 2 Cal.2d 590, 594 [42 P.2d 75]; *Sorensen* v. *Costa*, 32 Cal.2d 453, 458 [196 P.2d 900].)

In California, for many years it has been the law that "title by adverse possession may be acquired through

the possession or use commenced under mistake.'' (*Woodward* v. *Faris,* 109 Cal. 12, 17 [41 P. 781] ; *Lucas* v. *Provines,* 130 Cal. 270, 272 [62 P. 509] ; *Park* v. *Powers, supra,* 596; *Sorensen* v. *Costa, supra,* 460.)

 Respondents urged at the trial that appellants did not pay taxes on Lot A during the five-year period before respondents commenced the instant action to quiet title. It is conceded by appellants that they paid no taxes on Lot A as such. However, it is their contention that, since the certificates of assessment and payment of taxes on Lot A show it to have been vacant and unimproved, taxes on the parts of Lot A covered by their improvements were assessed and paid by them as a part of their taxes on Lot 285.

 There is in the record no finding as to payment of taxes. However, in support of the judgment, a finding that appellants did not pay taxes upon their encroachments must be presumed unless all the evidence is contra. We have carefully examined the entire record with reference to this question. It contains appellants' receipted bills for taxes on Lot 285 and improvements from 1938 to 1954. The improvements were assessed at $250 in 1938, $560 in 1939, $610 in 1940, $660 in 1941, $990 from 1942 to 1947, and $1,250 from 1947 to 1954. Also in the record are the certificates of payment of taxes on Lot A assessed to General Title Clearing Company from 1948 to 1952 and those assessed on a portion of Lot A to Publix Title Company for the year 1953 and paid by it December 10, 1954. Each of the certificates shows no improvements on Lot A during those years. The respondent testified that Lot A was vacant when he purchased it in 1952, and no building had been done thereon by him.

In 1893, our Supreme Court had before it the case of *McDonald* v. *Drew,* 97 Cal. 266 [32 P. 173], involving the land of coterminous owners. Defendant had for more than five years had a strip of plaintiff's land within his fence. Each had paid the taxes assessed to him for his respective lot by number. Judgment for defendant was reversed, and the court, at page 269, said:

''The controversy is reduced to the question of law as to whether the possession of the defendants could have been adverse without payment by them of all taxes which had been levied and assessed upon the land in question during the five years' period of the alleged adverse possession, as required by section 325 of the Code of Civil Procedure.

"This question has been answered negatively by this court in several cases."

Other cases have followed the above rule:

In *Frericks* v. *Sorensen,* 113 Cal.App.2d 759 [248 P.2d 949], the disputed parcel was covered by a shed, chicken house and rabbit hutches. Owners of adjoining land paid taxes assessed to them on the descriptions of their respective deeds. The taxes on the improvements were assessed to and paid by the party who was not the record owner of the land under them. The court, at page 762, said:

". . . Although these descriptions on the tax roll conformed to the deeds of the parties, they did not describe the parcels which the parties occupied. The land which was assessed to plaintiffs and their predecessors by a visual observation on the ground was 342.05 feet in depth. This was necessarily so inasmuch as the improvements were assessed to their land. Plaintiffs and their predecessors not only paid taxes upon the land which they occupied, but they were the equitable owners of it.

"While the assessment roll described defendants' land according to their deed, they were not actually assessed for the 50.5 feet upon which the shed and other improvements were located. The assessment roll did not correctly describe the land which was actually assessed to either the plaintiffs or the defendants and their predecessors. Payment of taxes under these circumstances was payment of taxes upon land in the possession of the parties. The court correctly determined that plaintiffs and their predecessors had paid all taxes on the land in dispute and that plaintiffs have a good prescriptive title. (*Price* v. *DeReyes, supra,* 161 Cal. 484 [119 P. 893] ; *Sorensen* v. *Costa,* 32 Cal.2d 453 [196 P.2d 900].)"

Under the facts in the instant action, it is apparent that defendants paid taxes on the whole of their residence including the lanai and upon the land under them, not merely to the property line which was in no manner marked upon the land.

The judgment is reversed.

Doran, J., and Fourt, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied January 30, 1957.