72 Cal.Rptr.3d 520 (2008)
160 Cal.App.4th 62
Estate of Irma E. YOUNG, Deceased.
Stephen C. Parker, as Administrator, etc., Petitioner and Respondent,
v.
Charles D. Parker et al., Objectors and Appellants.
No. D048937.
Court of Appeal of California, Fourth District, Division One.
February 15, 2008.
*524 James C. Stevens, San Diego, for Objectors and Appellants.
Kenneth H. Stone and Norman Michael Cooley, San Diego, for Petitioner and Respondent.
HUFFMAN, J.
Stephen Parker, as administrator of the estate of Irma E. Young, deceased (the Estate), filed this petition under Probate Code section 850, subdivision (a),[1] to request an order and judgment establishing the Estate's ownership of certain real property and personal property held by and associated with a number of land trusts and business trusts created during the lifetime of Young, on the basis that "the decedent died having a claim to real or persona] property, title to or possession of which is held by another." (§ 850, subd. (a)(2)(D).) The trial court ruled that the Estate was the prevailing party, because it had showed sufficient evidence of undue influence and fraud in the establishment of the trusts. Judgment was issued ordering objectors and appellants, Charles D. Parker, R. Richard Evans, and Inland Valley Management (IVM, a business trust entity) (sometimes collectively referred to as Objectors) to return Young's real property that had previously been transferred to the land trusts, and to vest its title in the Estate. The court additionally ordered that an accounting regarding personal property of the Estate that must be returned should be completed when the judgment became final.[2] However, although liability for double damages under section 859 was adjudged against Objectors, no damages were awarded to the Estate for wrongful taking of property, for lack of supporting evidence about the value of the real property taken. (§ 859 ["If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent ..., the person shall be liable for *525 twice the value of the property recovered by an action under this part. The remedy provided in this section shall be in addition to any other remedies available in law to a ... personal representative or other successor in interest of a decedent].")
Objectors now challenge that judgment for lack of substantial evidence to support the findings of fraud and undue influence. They also claim the petition was timebarred, because it was filed more than five years after Young was deemed to be aware or constructively on notice of potential problems with the trust arrangements concerning her real property. (Code Civ. Proc, §§ 318, 319, 366.1.)
The Estate (petitioner and respondent) cross-appeals the judgment, on the basis that the trial court erroneously denied it the opportunity to present evidence of the value of the real property taken, on which the Estate's claim for double damages would be based.[3]
We find that the judgment in favor of the Estate is adequately supported by substantial evidence, regarding return of the real property and allowing an accounting regarding the personal property. We further find that the statutory language of section 859 supports the Estate's position that the trial procedure it used here, to prove liability before providing underlying evidence of double damages in the form of real property valuations, was not inappropriate. Even though the Estate should have expressly sought bifurcation of liability and damages, it impliedly did so, and it never waived its claim of double damages regarding the real property taken. (§ 1000 [Code Civ. Proc. rules of practice apply in probate proceedings; Code Civ. Proc, §§ 598,1048, subd. (b)].) Accordingly, the trial court should have allowed further proceedings regarding damages, either by granting the Estate's motion to reopen the proceedings, or by ordering that proof of the value of the real property could be established as part of the accounting to be conducted postjudgment. Under all these circumstances, it was an abuse of discretion not to do so. We reverse the judgment to that limited extent only, affirming as to the balance, and remand for further appropriate proceedings on the double damages and accounting matters.

FACTUAL AND PROCEDURAL BACKGROUND
We will only generally outline these complicated transactions and proceedings, adding more detail in the discussion portions of this opinion as necessary.

A

Creation of Land Trusts and Operational Trusts; Background
Beginning in 1951, Irma Young became a successful entrepreneur in the nursery business. She acquired substantial assets, including the subject eight parcels (six acres) of real property in the Blossom Valley area of San Diego County. Her four children, including the eldest, Charles Parker (Objector or Charles) and his brother, Stephen Parker (the Estate's administrator or Stephen), participated in the family businesses at various times. One of Young's properties was leased to another nursery, The Color Spot, which created lease proceeds of approximately $10,000 per month from 1993-1999.
During the 1980's and in 1991, Young established an estate plan and inter vivos trust which equally benefited her four children, *526 with the assistance of her lawyer at the time, Dennis Burns. Mr. Burns represented her for 15 years for estate planning purposes and a bankruptcy of one of Young's businesses, Green Thumb Nursery. In the 1991 estate plan, Charles was expressly to be allowed to take his inheritance only if he did not have any tax liabilities at the relevant time. During the 1990's, Young's physical health declined, but she remained in normal mental health until her last illness in 2000.
In 1992-1993, Charles was attending seminars about asset protection, such as land trusts and tax planning. He told his mother, then age 78, about them and she became interested in those concepts, even though her attorney, Mr. Burns, told her he did not believe that some of the opportunities (land trusts) were legitimate tax avoidance devices. Young's accountant did her taxes and Charles did not know her tax bracket. Young was excited about the idea of asset protection and Stephen did not object at the time. He, Charles, and Young attended such seminars together. Stephen felt that "the buck stop[ped] with him" as far as his mother's finances were concerned.[4]
Charles introduced Young to several persons that he had met at such seminars, who had businesses preparing land trusts and other investment devices, and he took her to Arizona to meet with consultants. She paid approximately $30,000 to several persons to prepare such documents, some of whom took the money and did no work, but eventually, the trusts were completed by Bruce Stokes, who ran firms called Dublin Management and Scioto Equity Financial Group, a Nevada corporation (collectively referred to as Stokes).
In 1993, Young, as grantor and beneficiary, executed eight "tax avoidance" or "land trusts" that had been created by Stokes (all called Blossom Valley Properties Trusts). Stephen was appointed as trustee and he signed the trust documents that Charles gave him. Young then signed deeds to transfer her eight parcels of real property, worth over $1 million, into them. The trust documents stated that Young was the named beneficiary.
In the same set of transactions, three operational or business trusts were created at the same time, also under Charles's guidance, by Stokes on behalf of Young. In each of these trusts, Stokes was a named trustee. In each of these, the trust documents do not designate a beneficiary. First, Blossom Valley Holdings (BVH), was supposedly created by Larry Bemis as settlor, who denied at trial in a videotaped deposition that he had done so, although he admitted he had known Stokes as a business associate. Minutes of BVH *527 transactions and a chart were created to show that the BVH beneficial interests were held by the four Parker children equally. Next, Young assigned her own beneficial interest in the land trusts to BVH.
In addition, Young participated in creating two other operational or business trusts drafted by Stokes. The next one was Blossom Hill Investments (BHI), which was a loan business run by Charles. Young was its manager and wrote checks on the BHI account. Her Dean Witter brokerage account of $500,000 was assigned to BHI. She paid rent for her home on one of the properties to IVM, in return for its management of her property and some benefits. Stokes was again named as trustee of BHI, and Bemis later denied creating it even though his name was on it as settlor.
Third, IVM was supposedly established by an unknown firm called Commerce International Trust (Commerce International) as settlor, whose trustee, Southern Enterprise, Ltd. was based in the Caribbean islands (Turk and Caicos). Commerce International at some point became a beneficiary of IVM. It was also the trust's certificate holder, serving some kind of trustee function.[5] IVM employed Charles as manager and his family as employees, and it received The Color Spot lease proceeds that had been assigned to it from 1993-1999.[6]
In 1995, Stokes decided to relocate, and a successor trustee was needed, especially for IVM. For this purpose, Charles introduced Young to Evans, who had a business creating trust documents and acting as a professional trustee. She told him that she did not want the real property to be sold. Evans told Young that the trusts needed to be updated and corrected, and there were potential tax problems because there was an identity of interest among the various trusts, including BVH. Evans drafted new bodies of the land trusts, with sequential Roman numeral identifiers, backdated them and retained the original signature pages, and told Young about them. He shredded and burned the original copies of the old pages, but a copy was inadvertently saved. Stephen was not told that the 1995 documents were backdated to 1993. At Charles's request, Stephen signed signature pages that did not include the remainder of the documents, because Charles told him they were needed for Young's estate.
In 1995, Evans also prepared an assignment of the beneficial interest of the land trust from BVH to IVM, which meant that IVM controlled the real property. The certificate holder of IVM (Commerce International) was not able to be located so the substituted trust provisions allowed the new IVM trustees, Evans and a Susan O'Brien, to distribute the assets or income of the trust. Charles, the manager of IVM, knew about the substitution, but Young and Stephen did not. Charles was making loans for second trust deeds with BHI funds and showed them to Young. When Evans was asked at trial if IVM or BHI had filed tax returns in the late 1990s, he took the Fifth Amendment instead of *528 answering. Young trusted Charles and Evans up until at least the early part of 2000 and did not complain about the transactions.
In 1995, Young saw her former attorney, Mr. Burns, and told him she thought she had made a mistake by participating in the trust arrangements, as she might have lost control of her property. He asked her if she had gotten involved in one of Charles's "schemes," and she said yes. He then told her that he had advised her against that, but she had not listened to him, and he could no longer help her and she should get another attorney. There was evidence that Mr. Burns told Young and Stephen in 1993 that he thought Young was off base in those trust arrangements.
In April 2000, Stephen became aware that Young was gravely ill. She asked him to check into the status of her estate and property, but he could not find any estate planning or trust documents in the places that she told them they were stored at her house. Charles did not supply any when Stephen asked him for them. Stephen then requested information from Evans, whom he had just met, and Evans told him Young no longer owned any property, as it was in trust, so none of the children would inherit anything. He told Stephen that he was not really entitled to review trust documents, because they were "out of [his] jurisdiction," so to speak. However, Evans gave him a copy of one of the land trusts.
Stephen told Young about this and she said Charles and Evans were crooks. In May 2000, she called her four children to the hospital and told them that her plan was that each should share equally in her estate, and asked Charles to verify that that was her intent, which he did.
On July 30, 2000, Young died. Stephen was appointed the administrator of her estate. In that capacity, he formally requested that Charles and Evans supply him with business records relating to trusts, disposition of funds or property, and the original irrevocable land trust dated September 27, 1993. They replied that they did not have any such documents except for the 1991 will and inter vivos trust. The trusts had no cash left.

B

Filing of Petition; Amendment
On March 28, 2001, the Estate filed its petition seeking to establish its ownership to the subject real property and requesting an order directing transfer of the property to the Estate, as well as an accounting. (§ 850, subd. (a)(2)(D).) The petition alleged that Charles, through undue influence, had persuaded his mother to create the "tax avoidance trusts" and to transfer her eight parcels of real property, worth over $1 million, into them. In addition, the petition alleged that the three operational or business trusts created to manage the properties and to manage Young's personal finances were not legitimate entities and had no legitimate purposes.
The amended petition filed in October 2004 requested that the real property held in the land trusts be transferred to the Estate, added quiet title allegations, and requested that Objectors be directed to transfer to the Estate any remaining personal property. Breaches of fiduciary duty were alleged. The amended petition alleged that over $1.5 million of Young's income and assets had been misappropriated through undue influence, fraud and/or bad faith. The amended petition requested an accounting of all revenues and expenses for the three operational or business trusts from October 1993 to the present. Entitlement to punitive damages was pled, along with an order holding Objectors liable to the Estate "for twice the *529 value of the property recovered hereby," under section 859.

C

Trial, Statement of Decision
At the outset of trial, the probate court heard a motion by Objectors to bifurcate the trial to postpone any introduction of evidence of their net worth or profits, regarding the punitive damages request. (Civ.Code, § 3295.) The court asked if that was really necessary, since this was a bench trial, but it granted the request. It then heard five days of testimony from Charles, Stephen, Evans, Burns, and many other interested parties, about the events outlined above and their perceptions of Young's knowledge about the details of the trusts and her ability to make business decisions during that time period. At some point, the Estate decided not to pursue punitive damages. Extensive documentary evidence was admitted and considered by the court.
At trial, Objectors took the position that the petition was not timely filed in 2001, because the conversations between Young, her attorney Mr. Burns in 1995, and Stephen in 1993, had placed her on notice of any potential problems with the trust, but she had decided to proceed anyway and had not taken any corrective action. The Estate responded that it was not until 2000 that its representative became aware of problems with the trust arrangements and the disposition of Young's assets, so as to start the running of any limitations period. Stephen did not know who Evans was until 2000. Neither opening nor closing arguments were reported.
The trial court issued a tentative decision analyzing the evidence as follows. It first found there was no bar of any potentially applicable statutes of limitation regarding the real property transfers (such as quiet title), due to the existence of undue influence on Young and delayed discovery by the Estate. (Code Civ. Proc, §§ 338, subd. (d), 318 & 319.) Next, the court found that the evidence established that Charles had exerted undue influence upon Young in persuading her to enter into the trust arrangements, which were financially disadvantageous for her. Evans had acted in a fraudulent manner when he substituted new portions for the previous versions of the trust documents. The court rejected Objectors' defense that the money had been lost simply due to an unfavorable business climate, without any fraud taking place.
Upon receipt of the tentative decision dated March 3, 2005, Objectors responded that the Estate had rested its case without presenting evidence of the value of the real properties, upon which to base the double damages request, and the case should be over. The court received a response and issued a request for further briefing. The parties vigorously disputed whether Objectors' request for bifurcation of the punitive damages portion of the case had impliedly also postponed the presentation of evidence supporting the double damages award under section 859. Objectors accused the trial court of being predisposed in the Estate's favor by ruling on damages without sufficient evidence. The trial court reminded Objectors' attorney of the local rule requiring respect toward the court and counsel.
In the final statement of decision, dated April 15, 2005, the court concluded that counsel for the Estate had failed to present any evidence regarding the value of the real properties, and no double damages could be awarded due to that failure of proof. The remaining requests regarding the personal property (return of funds, etc.) were denied without prejudice pending an accounting to be prepared upon the *530 judgment becoming final in the trial court, or after appellate review. Judgment was entered accordingly, stating that because of the breach of fiduciary duty, Objectors are liable for double damages for bad faith taking of property; "however no damages are awarded as to [Objectors]' wrongful taking of property as Petitioner failed to offer evidence as to the value of the real property." The Estate's motion to reopen was denied in July 2005.
Both parties timely filed their respective notices of appeal and cross-appeal of the judgment.

DISCUSSION
Objectors first challenge the judgment as erroneous with respect to the trial court's ruling that the petition was timely filed within the applicable limitations periods, due to delayed discovery of the facts constituting undue influence and fraud. They further contend the record does not contain substantial evidence to support the judgment in the Estate's favor, and that the evidence actually showed that Young was capable of making her own investment decisions and did so of her own free will.
In the cross-appeal, the Estate argues the trial court erred as a matter of law in its statutory interpretation that denied the Estate an opportunity to prove double damages, based on the fiduciary duty and fraud claims. Alternatively, the Estate contends the denial of its motion to reopen to present evidence of the value of the real property was an abuse of discretion.
Section 850 et seq. provide a mechanism for court determination of rights in property claimed to belong to a decedent or another person. When the outcome of an appeal turns on the meaning of statutory phrases, such as whether the actions under review comported with particular statutory standards, courts may analyze the factual record using a flexible de novo approach; if none of the facts is disputed, the matter is decided as a pure issue of law. (Harustak v. Wilkins (2000) 84 Cal.App.4th 208, 213, 100 Cal.Rptr.2d 718.) Alternatively, the record may present mixed questions of law and fact, but where issues of law predominate, de novo review is appropriate "because of the need to consider legislative policy and the impact it may have on valuable inheritance rights in other cases. Resolving these issues will promote a uniform application of the statute in question." (Ibid.)
As the trial court in this matter aptly observed, Young was no longer present to give her version of the events, so the trial court had to evaluate the evidence as given by the remaining participants, to aid in interpreting the documents. In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" (In re Marriage of Hoffmeister (1987) 191 Cal.App.3d 351, 358, 236 Cal.Rptr. 543.) In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" (Howard v. Owens Corning (1999) 72 Cal. App.4th 621, 630, 85 Cal.Rptr.2d 386.) We may not reweigh the evidence and are bound by the trial court's credibility determinations. (Id. at p. 631, 85 Cal.Rptr.2d 386; see Heller v. Pillsbury Madison & Sutro (1996) 50 Cal.App.4th 1367, 1384, 58 Cal.Rptr.2d 336.) Moreover, findings of fact are liberally construed to support the judgment. (Winchell v. Lambert (1956) 146 Cal.App.2d 575, 581, 304 P.2d 149.)
*531 The usual definitions of substantial evidence apply: it is "evidence of `ponderable legal significance, ... reasonable in nature, credible, and of solid value.'" (Bowers v. Bernards (1984) 150 Cal. App.3d 870, 873, 197 Cal.Rptr. 925, italics omitted.) In determining its existence, we look at the entire record on appeal rather than simply considering the evidence cited by a party. (Ibid.) "The ultimate determination is whether a reasonable trier of fact could have found for the respondent based on the whole record. [Citation.] While substantial evidence may consist of inferences, such inferences must be `a product of logic and reason' and `must rest on the evidence' [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations]." (Kuhn v. Department of General Services (1994) 22 Cal.App.4th 1627, 1633, 29 Cal. Rptr.2d 191.) Any additional standards of review will be stated in the following section as necessary.

I

APPEAL: LIMITATIONS
"Statutes of limitation are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared. [Citation.]" (Parker v. Walker (1992) 5 Cal. App.4th 1173, 1188-1189, 6 Cal.Rptr.2d 908 (Parker).) Section 1000 permits application of Code of Civil Procedure rules of practice, including statutes of limitations, based on the underlying right asserted. (Parker, supra, at pp. 1184-1185, 6 Cal. Rptr.2d 908.) In Code of Civil Procedure section 366.1, the rule regarding claims of an estate is stated: "If a person entitled to bring an action dies before the expiration of the applicable limitations period, and the cause of action survives, an action may be commenced before the expiration of the later of the following times: [¶] (a) Six months after the person's death. [¶] (b) The limitations period that would have been applicable if the person had not died."
As explained in Parker, "`Neither the caption, form, nor prayer of the complaint will be deemed conclusive in determining the nature of the liability from which the cause of action flows. On the contrary, the true nature of the action will be ascertained from the basic facts a posteriori.' [Citation.]" (Parker, supra, 5 Cal.App.4th 1173, 1189, 6 Cal.Rptr.2d 908.) Thus, for purposes of analyzing the appropriate limitations period, we consider not only the purpose of the petition to recover real property, but also the fraud and undue influence allegations. Where the facts adequately allege breach of fiduciary duty or undue influence, the courts will allow a date-of-discovery rule to be applied, "`when strict adherence to the date of injury rule would result in unfairness to the plaintiff and would encourage wrongdoers to mislead their fiduciary to delay bringing suit. It is particularly appropriate when the defendant maintains custody and control of a plaintiffs property or interests.' [Citation.]" (Parsons v. Tickner (1995) 31 Cal.App.4th 1513, 1529, 37 Cal. Rptr.2d 810.)
Objectors argue there is no basis for a delayed discovery ruling. They rely on Attorney Burns's testimony about his discussions with Young in 1993 and 1995, to show Young must have had knowledge at those times of the accrual of any cause of action regarding significant disputes over title of the real property. Young was known as a successful retired businesswoman who did not have any mental disabilities in the 1990s, and who was generally capable of understanding business *532 transactions. Objectors correctly state that the mere existence of a family relationship did not constitute proof of undue influence on the part of Charles. (In re Estate of Stephens (2002) 28 Cal.4th 665, 677, 122 Cal.Rptr.2d 358, 49 P.3d 1093.)
Objectors then claim the trial court did not give proper weight to Attorney Burns's evidence. In the statement of decision, the court characterized as "vague" that testimony about the nature of Young's knowledge of the extent of the losses to herself and/or her children, regarding any remaining rights to the benefit of the real property held in the land trusts. The court concluded that Young had "expressed some unhappiness about events to her attorney, Mr. Burns, and he had some vague feeling that what Charles Parker was doing could affect her ownership interests in the property. [¶] The result of what Parker and Evans did really did not become known until about the middle of 2000. In fact, even around the time of her death, Charles Parker reassured Irma Young that all four children would inherit her property." The court therefore ruled the actual fraud was not discovered by the Estate until the middle of 2000, such that the cause of action accrued at that time.
To argue this was error, Objectors contend that various statutes concerning disputes about real property must instead provide the applicable limitations period. They rely on Code of Civil Procedure sections 318 (possession of real property), 319 (title to real property), and/or 328 (tolling of statute of limitations). As explained in Robertson v. Superior Court (2001) 90 Cal. App.4th 1319, 109 Cal.Rptr.2d 650 (Robertson), "[t]he overall effect of these sections is manifest: actions relating to either the possession of or title to real property ... must be commenced within five years from the end of possession or seizin of that property by the claimant or his or her predecessor in interest, unless his or her chain of title includes a person who was either a minor or insane, in which case a tolling period not to exceed 20 years is allowed...." (Id. at p. 1328, 109 Cal. Rptr.2d 650, fn. omitted.) According to Objectors, this authority should control here, because the gist of the petition is a title dispute, which became known by 1995, but the Estate was not diligent in discovering all the relevant facts.
However, the court in Robertson, supra, 90 Cal.App.4th at page 1325, 109 Cal. Rptr.2d 650, also recognized that various limitations provisions of the Code of Civil Procedure apply in actions to enforce rights stated in other codes (there, Civ. Code, § 3412 [cancellation of void instruments] ), or that arise in other contexts. Here, the Estate argues that the predominant allegations in the current case are fraud and undue influence, such that the general statements in the Robertson case about real property limitations statutes are not controlling. The trial court agreed, ruling that although Code of Civil Procedure sections 318 or 319 could apply if the quiet title or other real property theories were instrumental here, this was actually a case where fraud and undue influence were the pivotal allegations, explaining the delayed discovery of the cause of action. Moreover, the court acknowledged that the evidence surrounding these elaborate multi-level trusts made it difficult, if not impossible, to trace the changes in the beneficial interests, and counsel had difficulty doing so even at the time of trial. This supported the court's conclusion that Young could not reasonably have been expected to understand precisely what was happening at the time, nor could Stephen.
The record strongly supports this application of limitations rules and policies. The trial court correctly took into account *533 all of the evidence about the underlying circumstances of the transactions, and its selection of the fraud limitations period was a correct resolution of this mixed question of law and fact. (Harustak, supra, 84 Cal.App.4th 208, 212, 100 Cal. Rptr.2d 718.) Code of Civil Procedure section 338, subdivision (d) was the applicable rule for analyzing the timeliness of this probate proceeding, because delayed discovery was justifiably asserted and well supported, based on the misrepresentations and concealments on the part of Objectors, and the roles they played and undertook in Young's life and financial affairs. We next discuss the related evidentiary issues on the merits.

II

APPEAL: FALSE REPRESENTATION; CONCEALMENT; UNDUE INFLUENCE
This portion of the appeal is a substantial evidence challenge to the adverse judgment against Objectors on the merits of the petition. To evaluate this ruling, we first review the required elements for claims for fraud: "`(a) a misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (Lazar v. Superior Court (1996) 12 Cal.4th 631, 638, 49 Cal.Rptr.2d 377, 909 P.2d 981.)
Where incidents of undue influence are alleged, the following rules apply regarding the burden of proof. "`[W]here the relationship between the parties is that of parent and child and the parent relies on the child for advice in business matters, a gift inter vivos ... which is without consideration and where the parent does not have independent advice, is presumed to be fraudulent and to have been made under undue influence.' [Citation.] The burden of proof then shifts to the child `to show that the transaction was free from fraud and undue influence, and in all particulars fair.' [Citation.] Put differently, this presumption may be rebutted by `evidence that the act in question had its genesis in the mind of the parent and that he was not goaded to a completion by any act of such child.' [Citation.] The child's burden of proof is by a preponderance of the evidence. [Citations.]" (Estate of Stephens, supra, 28 Cal.4th 665, 677, 122 Cal.Rptr.2d 358, 49 P.3d 1093, fn. omitted.) We first set out the trial court's analysis of the evidence and the reasoning in its statement of decision, and we then discuss Objectors' various challenges to the judgment.
The trial court first ruled that there was a fiduciary relationship between Young and Objectors, based on Evans's position as trustee of her assets, and Charles's management of those assets. The court then found that the evidence supported the theories of both intentional misrepresentation and concealment. The court reasoned that there was no evidence showing why Young actually needed to avoid taxes or to seek specialized asset preservation, such as these land trusts supposedly accomplished. Instead, the result of the transactions was that she lost her lease income, her brokerage account, and title to her property. The court ruled that the 1993 trusts were null and void as the product of fraud and/or undue influence, so that their assets must be returned to the Estate. The court noted the evidence was that the BVH and BHI trusts were incomplete and fraudulent, based upon the testimony of the supposed settlor, Larry Bemis, which it found was credible about his lack of participation here. In any case, Bemis did *534 not own the Young property so could not have transferred any of her interests.
With regard to the 1995 changes in the trust documents, the court found that several factors supported conclusions of undue influence by Evans and/or Charles. The 199'5 concentration of all the beneficial interests in IVM was not in Young's best interests. Charles received concealed fees paid by Evans, who controlled IVM assets as well as the beneficial interest of all the land assets. The court found that the pattern of supposedly "poor economic decisions" from 1992 through 1996 was indicative of fraud and undue influence, because there was no perceptible benefit created for Young or her heirs, but instead only for Charles and Evans. The court stated that the evidence suggested Stephen was left out of the loop of information and Objectors isolated Young from him.
Finally, the court reiterated that any evidence was lacking that Young had any unusual tax problems or any particular need for asset protection. However, there was evidence that Charles was having ongoing problems with the IRS, so that Young had believed it necessary to limit his inheritance rights in her previous estate plan (only if he had no tax liability). The people who set up the trusts at large expense were "questionable," and no California lawyer was ever consulted in preparation of these documents. Charles benefited monetarily from his management of IVM, and Evans had control of the real property through a series of questionably motivated transactions. For example, the Caribbean Islands certificate holder of IVM was not shown to be a functioning company that ever existed, as opposed to an arm of Stokes or Evans. These facts as a whole revealed a clear pattern demonstrating fraud and/or undue influence. The court therefore found that Objectors had failed to carry their burden of showing that the transactions were free of fraud or undue influence, but rather, breach of fiduciary duty to Young and the Estate had been proven.
The court issued an order nullifying the trusts and returning the real property and beneficial interests to the Estate. The court also issued a restraining order restricting Objectors from taking action with regard to the personal property, pending the accounting that was ordered. (The damages ruling is discussed in pt. III, post.)
On appeal, Objectors contend that they made only true representations, and that the various business deals fell through for economic reasons that were not their fault. They also challenge the justifiable reliance element of fraud, by saying Young and Stephen signed all the relevant documents and were told about their substance. Objectors assert there is no proof of any damage here, because the land has not yet been sold, so some beneficial interest might be retained by the Estate. Finally, Objectors argue that they were not the procuring cause of Young's actions, and thus the record should not support any finding of undue influence. (Estate of Stephens, supra, 28 Cal.4th 665, 677, 122 Cal. Rptr.2d 358, 49 P.3d 1093.)
None of these arguments answers the particular, crucial problems identified' by the trial court. Objectors never identified why Young had an unfair tax burden or other need for extensive trust services. Charles never knew her tax bracket. By the time Young died, all the lease and brokerage money was gone and the property transferred away, but there were no discernible advantages to Young provided, other than some minimal property management services in return for her payment of rent to IVM and her management of BHI. Much more than an unfavorable business climate in Charles's private loan *535 business was shown to explain the loss of assets.
Next, the evidence taken as a whole showed that although Young and Stephen signed the documents that they were given, sometimes without the appropriate supporting materials, they did so under a misapprehension that the various transactions were consistent with Young's known estate plan, to benefit her four children equally. She never showed any intention to change that estate plan. This misapprehension was created by the false representations and undue influence of Objectors, as the evidence clearly showed. Third, ample proof of damage was made in the form of loss of monetary assets and title to the real property, even though it was not yet sold out from under the Estate. The trial court, by ordering an accounting, impliedly found that substantial evidence supported a finding of damage to the Estate, even if some expenditures had properly been made for preservation of the real property, and in light of potential past or future tax liabilities.
Finally, to the extent that Objectors argue that they were not the procuring causes of Young's actions, they fail to rebut the circumstantial evidence that these transactions in part and in whole were entirely disadvantageous to Young, and that she would not have entered into them if she had fully understood that they controverted her known prior estate plan. In conclusion, substantial evidence, both direct and circumstantial, supports the trial court's conclusions in its statement of decision.

III

CROSS-APPEAL
The Estate challenges the judgment with respect to the trial court's rulings on the double damages issues. First, it contends that when the trial court agreed to bifurcate the issue of net worth for punitive damages purposes, at the request of Objectors, this amounted to an implied bifurcation ruling regarding liability and damages as to another type of damage request that is also punitive in nature, i.e., double damages under section 859. Next, the Estate argues that the accounting it had requested automatically triggered an obligation of the trial court to, in effect, defer the determination of damages under section 859 until the liability determination was completed under section 850. Those arguments are made under a theory of statutory interpretation, under which courts will construe related statutory provisions together, on a de novo basis, in an effort to implement the intent of the Legislature. (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1386-1387, 241 Cal.Rptr. 67, 743 P.2d 1323 (Dyna-Med).)
Further, the Estate claims that the order denying its motion to reopen the proceedings for further evidence is an abuse of discretion under these circumstances. The record and applicable precedents must be considered in evaluating such an exercise of judicial discretion, which involves the "`"exercise of discriminating judgment within the bounds of reason. [¶] To exercise the power of judicial discretion all the material facts in evidence must be known and considered, together also with the legal principles essential to an informed, intelligent and just decision." [Citations.]' `The appropriate [appellate] test for abuse of discretion is whether the trial court exceeded the bounds of reason.' [Citations.] [¶] `... To be entitled to relief on appeal from the result of an alleged abuse of discretion it must clearly appear that the injury resulting from such a wrong is sufficiently grave to amount to a manifest miscarriage of justice....' [Citation.]" *536 (Estate of Gilkison (1998) 65 Cal. App.4th 1443, 1448-1449, 77 Cal.Rptr.2d 463.)
To address these issues, we evaluate the manner in which the trial was conducted on the merits of the substantive issues, in light of applicable rules of practice.

A. Litigation/Procedure
We first examine the extent to which the double damages issue was presented to the trial court in the pleadings and in trial preparation. The amended petition requested that the real property held in the land trusts be transferred to the Estate and it sought to quiet title to those eight parcels of real property, worth over $1 million. Orders were requested directing Objectors to transfer to the Estate any remaining personal property. Breach of fiduciary duty was pled, and an accounting of all revenues and expenses for the three operational or business trusts was sought. Punitive damages were sought, along with an order holding Objectors liable to the Estate "for twice the value of the property recovered hereby" under section 859.[7]
We first observe that the trial record is somewhat sparse, in that the opening and closing statements of counsel were not transcribed by the reporter, and the trial briefs have not been included in the appendices provided. The reporter's transcript shows that the first order of business at trial was to discuss and bifurcate the punitive damages claims, as to any evidence of net worth of the Objectors, or their profits. Evidently, no formal motion in limine was brought, but the trial court agreed with Objectors that it would be inappropriate at that time to consider evidence of their net worth or financial conditions for purposes of punitive damages. However, evidence of financial transactions that were relevant to the trust allegations of undue influence was allowed. Eventually, counsel for the Estate confirmed with the court that it was seeking double damages provided under the Probate Code, as opposed to punitive damages. (§ 859.)
Midway through trial, Objectors made a motion for judgment which was argued to the court. (Code Civ. Proc, § 631.8.) Objectors sought, at a minimum, to have the court rule in their favor on the personal property claims raised, since they argued Young always knew where all of the money was going. They sought this result even if the court still had to rule on the issue of title to the property,' i.e., whether it stayed in the land trust or not, as the main issue at that point was who should hold the beneficial interest in the land trusts. The court then inquired of counsel for the Estate what relief was currently being sought, in addition to invalidating the transfers of title to the real property into the land trusts. Counsel for the Estate responded that they were seeking an accounting, and he mentioned two stages: the preliminary issues of undue influence, and then a later proceeding to determine whether Objectors had received money from the Estate, and the issues of whether those funds had properly been spent for the benefit of the Estate, or should instead be surcharged against Objectors. *537 The court then inquired, apparently in reference to the arguments about the Estate's money that had been spent, "and then, in terms of double damages, you're not asking that that be doubled at this point? We're talking mainly about the land?" Counsel for the Estate replied, "We're talking about the land in the context of double damages, Your Honor." The court then denied the motion for judgment and testimony resumed.[8]
Throughout the trial, the Estate's evident purpose was to show the existence of undue influence, fraud, and concealment, and to seek relief in the form of an order to Objectors to return the real property to the Estate, along with related personal property. At all times, Objectors contested the allegations of fraud and undue influence, contending that Young had voluntarily placed the property into these trust arrangements and had a good understanding of all the transactions, and that all monies were properly spent. It was not disputed that approximately $500,000 from Young's brokerage account had been expended by the trusts, nor that The Color Spot lease proceeds were spent. However, there was never any inquiry into the current financial conditions of Objectors, due to the bifurcation order.
At the conclusion of trial, the court's tentative and final statements of decisions extensively analyzed all those evidentiary issues regarding the probable intent of the decedent, Young. Tentatively, the court ordered that double damages would be awarded under section 859, based on Objectors' fraud in 1993 and 1995, and "an appraisal of the real property will be required to determine the value of the real property so that proper damages may be determined."
Upon receipt of the tentative decision dated March 3, 2005, Objectors took the position that the Estate had rested its case without presenting evidence of the value of the real properties, upon which to base any double damages request. After further proceedings in which the extent of the bifurcation order regarding punitive damages was disputed, the trial court concluded that counsel for the Estate had failed to present any evidence regarding the value of the real properties, and no double damages could be awarded due to that failure of proof. The remaining requests regarding the personal property (funds, etc.) were denied without prejudice pending an accounting to be prepared upon the judgment becoming final in the trial court or after appellate review.
The Estate brought a motion to reopen the proceedings to take further evidence regarding the value of the real property. It argued that at trial, the court had acknowledged that the eight parcels of real property could be worth a little or a lot, depending on whether the lots were suitable for construction. Counsel for the Estate submitted declarations in support of reopening. Its probate attorney stated that he had been unable to obtain records for over four years from Objectors about trust activities and expenditures, so it had not yet been possible to determine the *538 productivity or profit potential of the subject real property or its fair market value. He had not spent money on appraisals because he believed he should preserve the assets of the Estate before doing so. The Estate's trial counsel submitted a declaration about his belief that he had to prevail on the petition to determine title and meet the criteria of section 859, so the issue of the value of the property or potential double damages awards could next be considered. In counsel's opinion, the accounting phase of the case would be the proper place for valuation of the real property and a double damages assessment, as it was not possible to complete those inquiries until the accounting was completed regarding income received from the real property over the years. Finally, trial counsel sought relief based on inadvertence or inexcusable neglect, since it had been reasonable for counsel to believe that the double damages assessment would be made in the accounting phase of the case. Objectors opposed the motion, arguing proof of value of the real property was essential before any damages could be calculated or doubled.
The motion to reopen was denied in July 2005, for lack of a good cause showing, since the only accounting that was requested in the petition specified the personal property, not the real property. The trial court correctly rejected Objectors' position that section 859, enacted in 1994, should not be applied retroactively. The court noted that section 859 was the successor version to section 9869, to the same effect.

B. Statutory Scheme and Interpretation
There is very little case law interpreting these statutes, section 859 and its predecessors. However, some version of the double damages statute in probate has been operative since 1850. The 1850 version provides: "If any person, before the granting of letters testamentary, or of administration, shall embezzle or alienate any of the moneys, goods, chattels, or effects of any deceased person, he shall stand chargeable, and be liable to the action of the executor or administrator of the estate, for double the value of the property so embezzled or alienated, to be recovered for the benefit of the estate." (§ 117, Stats. 1850, 1st Sess., ch. 129, ch. IV, p. 386.) Former section 9869 (stats.1994, ch. 806, § 32), enacted in 1994 but repealed and transferred in 2001 to current section 859, was similar.
The challenged ruling must be analyzed in context of the statutory nature of the proceeding. Under section 800, the court sitting in probate is a court of general jurisdiction and has the same power and authority with respect to the proceedings as otherwise provided by law for a superior court. Section 1000 applies the rules of practice found in the Code of Civil Procedure to probate trials. When a petition is brought under section 850, the issues include, as relevant here, whether the decedent died having a claim to real or personal property, title to or possession of which is held by another. (§ 850, subd. (a)(2)(D).) Pursuant to section 855, "[a]n action brought under this part may include claims, causes of action, or matters that are normally raised in a civil action to the extent that the matters are related factually to the subject matter of a petition filed under this part."
Upon a sufficient showing, the probate court "shall make an order authorizing and directing the personal representative or other fiduciary, or the person having title to or possession of the property, to execute a conveyance or transfer to the person entitled thereto, or granting other appropriate relief." (§ 856.) Such an order is prima facie evidence of the correctness of the proceedings and of the authority of the *539 personal representative or other fiduciary or other person to make the conveyance or transfer, and the order vests the person obtaining the order with the right to the possession of the property according to the terms of the order, "as if the property had been conveyed or transferred in accordance with the terms of the order." (§ 857, subds. (a) & (b).)
Next, under section 859, a particular form of damages is authorized: "If a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to the estate of a decedent, conservatee, minor, or trust, the person shall be liable for twice the value of the property recovered by an action under this part. The remedy provided in this section shall be in addition to any other remedies available in law to a trustee, guardian or conservator, or personal representative or other successor in interest of a decedent."
The relief requested in the original and amended petitions included an accounting of the revenues and expenses regarding the real properties, and for the three business or operational trusts. The amended petition added a prayer for punitive damages and a declaration of liability to the Estate "for twice the value of the property recovered hereby" under section 859.
A comprehensive statutory scheme, section 1060 et seq., governs all accounts filed with the probate court. These must include a summary of account, supporting schedules, and a petition or report accompanying the account, according to prescribed formats. (4 Witkin, Summary of Cal. Law (10th ed. 2005) Wills, § 384, p. 467.) "Filing an account is deemed to include a petition requesting approval of the account. The account may include additional petitions for authorization, instructions, or confirmation authorized by the Probate Code, including a request for an order for compensation of the fiduciary and the attorney. [Citation.]" (Id. at p. 468.) In cases in which fraud or breach of fiduciary duty are found, grounds for an accounting are proven. (Union Bank v. Superior Court (1995) 31 Cal.App.4th 573, 593, 37 Cal.Rptr.2d 653.)
To evaluate the trial procedure used here, we measure it against the statutory standards of section 850 et seq., and also the importation of civil procedure rules of practice into probate proceedings. Our inquiry is whether the Estate failed to prove an essential element of its claim under section 859. To answer this question, we first apply rules of statutory interpretation, and then analyze the exercise of discretion in this case. In construing a statute, we seek to ascertain legislative intent in order to implement the purpose of the law:
"In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.]" (Dyna-Med, supra, 43 Cal.3d 1379, 1386-1387, 241 Cal.Rptr. 67, 743 P.2d 1323.)
In distinguishing between types of available remedies, the Supreme Court has utilized a dictionary definition of "remedy" as "`something that corrects or counteracts an evil: corrective, counteractive, reparation. *540 ... [T]he legal means to recover a right or to prevent or obtain redress for a wrong....' [Citation.]" (Dyna-Med, supra, 43 Cal.3d 1379, 1387-1388, 241 Cal. Rptr. 67, 743 P.2d 1323.) In contrast, punitive damages "are neither equitable nor corrective; punitive damages serve but one purpose-to punish and through punishment, to deter. `Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor whose wrongful action was intentional or malicious, and to deter him and others from similar extreme conduct.' [Citations.]" (Ibid.) Using these considerations, the accounting requested here, as well as the transfer of property, were remedial in nature. The double damages were punitive in nature. We find support for this conclusion in several sections of California Trust and Probate Litigation (Cont.Ed.Bar 2007) section 13.46, pages 430 to 431, summarizing the use of punitive damages against trustees or personal representatives (under § 10381), and including in the same section a discussion of double damages under section 859, for bad faith taking of an estate's property. Also, the same treatise, at section 15:19, pages 501 to 502, explains that sureties are not subject to double liability under section 859, but only for actual loss, and further explains, "a surety is liable for actual loss, not for damages that punish a representative for intentional misconduct." (Italics added.) The doubling of damages is a punitive measure. (Also see comparable damages provisions in the antitrust and unfair competition fields, Bus. & Prof. Code, §§ 16750,17082.)[9]
In the annotations to Civil Code section 3294, defining exemplary damages, many cross-references are given to other provisions that establish liability for damages that are punitive in nature. Among these are the predecessor statute to section 859, former section 9869 (as well as § 10381, establishing liability for double damages for fraud in the sale of estate property). The fact that some statutory damages provisions are punitive in nature does not itself establish the proper procedure for adjudicating them. With respect to punitive damages under Civil Code section 3294, there is an express provision for bifurcation under that code's section 3295, which has two major purposes: promoting judicial efficiency in bifurcating liability and damages, and also allowing a protective order for personal privacy in a defendant's financial affairs. The order of bifurcation does not prohibit the introduction of prima facie evidence to establish the underlying case for punitive damages. (Civ.Code, § 3295, subd. (b).)
In the case before us, the question is what prima facie evidence was required to establish the case for double damages, and under section 859, a wrongful taking had to be established first, and then an order to provide for recovery of the property to the Estate. (§§ 856, 857.) Until that point, valuation of the subject property was not *541 necessary, only an inquiry about title. The fact that section 859 expressly provides that its remedy is in addition to other remedies available also supports a bifurcation procedure. Here, the judicial economy factor is paramount over any protective order function, since Objectors created several layers of trusts with beneficial interests, such that their personal financial involvement and condition could not be determined without a preliminary investigation into the validity of the beneficial interests of the trusts. These factors support a statutory reading of section 859 that the Estate's right to title of the property should be established before any subsequent consideration of damages, which in turn would defer the valuation portion of the trial.
A federal bankruptcy court has reached similar conclusions in In re Pereira and Melo Dairy (Bank.E.D.Cal.2005) 325 B.R. 1, 4-5, dealing with a conservatorship and the proper order of proceedings under section 850 et seq. The court opined, "Once property is recovered under Section 850, it becomes `property belonging to the estate of ... a conservatee' and a double recovery is available if the court then finds that the property was wrongfully taken in bad faith. The double recovery is not available in a vacuum. It requires that the conservator first prevail under Section 850. Damages equal to twice the value of any property allegedly "taken[,] concealed or disposed of are recoverable in § 850 proceedings from the persons who in "bad faith" deprived the estate of same.' [Citation.]" (In re Pereira, supra, at pp. 4-5, italics added.) The bankruptcy court also noted that "double recovery is unavailable until the court determines that the property is recoverable under Section 850. For that to occur, the court must determine that the transfers are somehow defective." (In re Pereira, supra, at p. 5.)
These distinctions are important because the Estate's petition sought a number of different kinds of relief, some remedial and some punitive, and the requirements for showing entitlement to those forms of relief differ, as well as the timing for making such showings. Specifically, the language of section 859 requires a showing of bad faith taking of estate property before double damages may be assessed. On a preliminary basis, we agree with the Estate's position that the plain language of section 859 contemplates that a showing of liability should be made before the damages phase begins, because a finding of bad faith taking of an estate's property is anticipated, along with adjudication of a right to recovery of that property, before a damages assessment will be made of liability "for twice the value of the property recovered by an action under this part." The conditions set forth in sections 850 through 857 must be proven before a damages entitlement under section 859 becomes operative and can be adjudicated as to amount.
It is admittedly difficult to apply the statutory language to this set of facts, because any punitive effect upon Objectors must be filtered through the elaborate trust structure that they set up. The liability determination had to take all those factors into account, which provides another reason that bifurcation would have been appropriate here. In any case, a plain reading of the statutory language is not the end of the inquiry, and we next turn to the rules regarding the discretionary power of the court to control the order of proof, as well as the obligations of the parties to carry their respective burdens at trial. We may then determine what result is in keeping with the purpose of the statute.

C. Conduct of Trial; Discretion of Court
Code of Civil Procedure section 598 allows a party to seek an order before trial *542 "that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case," where "the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby ... [disregarding special defenses, not applicable here]." At any time, the trial court may make such an order, on its own motion. In 7 Witkin, California Procedure (4th ed. 1997) Trial, section 168, pages 195 to 197, the authors explain the purpose of bifurcation where both liability and damages are contested: that "time spent in trying the issue of damages is wasted if the verdict or finding is against liability." Particularly where punitive damages are sought, "the defendant may request preclusion of evidence as to financial condition until after actual damages are awarded and the defendant is found guilty of malice, oppression, or fraud. [Citation.]"
In Grappo v. Coventry Financial Corp. (1991) 235 Cal.App.3d 496, 286 Cal.Rptr. 714, the appellate court explained that bifurcation can be ordered when liability and damages are both in dispute, even where no formal motion under Code of Civil Procedure section 598 was brought. The trial court in that case properly acted on its own motion, by exercising its discretion to regulate the order of proof (Evid.Code, § 320), and to order separate trials of a cause of action or issue. (Code of Civ. Proc., § 1048, subd. (b).) In that case, the issue was whether a party had any interest in the subject property, which was preliminary to deciding a question of priority of the interests. (Grappo, supra, at p. 504, 286 Cal.Rptr. 714.)
Likewise, in Rosenfeld, Meyer & Susman v. Cohen (1987) 191 Cal.App.3d 1035, 1052, 237 Cal.Rptr. 14, the court acknowledged that trial courts have broad discretion in deciding whether to reopen evidence. It found on the facts before it that no such discretion had been abused when the trial court denied a motion to reopen the trial for presentation of further evidence. The party requesting to have the matter reopened was shown to have been on notice several months before trial that it might have the burden of proof on the particular issue involved, but it had done nothing. It was reasonable for the court to conclude the party's approach was a strategic decision or informed choice of trial tactics, that it took that chance, and for the court to deny relief accordingly. (Id, at pp. 1052-1053, 237 Cal.Rptr. 14.)
Acknowledging that the trial court had the discretion to control the order of proof and the proper organization of the issues before it, we next turn to the role of the parties in making the appropriate requests of the court to exercise an informed discretion. Here, there was major confusion at trial about the scope of the issues in the petition, and the relationship of the requests for punitive damages and double damages under section 859. Arguably, counsel for the Estate made some unwarranted assumptions that he could "piggyback" upon the motion for bifurcation made by Objectors, regarding punitive damages. It is apparent that counsel for the Estate did not adequately apprise the trial court of his statutory interpretation of the method of proof for double damages required by section 859, even though this court does not have a record of opening and closing statements or the trial briefs. We are reluctant to criticize the trial court for an abuse of discretion when there was no express request made to bifurcate the issue of liability from the issue of double damages.
Nevertheless, when the nature of those double damages is properly understood as punitive in nature, the need for separate liability and damages phases becomes *543 clear, and it was eventually made clear at trial, at least by the time of the motion to reopen. Specifically, the major focus of the petition was to regain title to the real property that had been transferred to the trusts, pursuant to undue influence, fraud, and concealment. It is understandable that the Estate's trial preparation here did not involve an appraisal of the land or expert testimony about land value, when it was unclear whether title would be regained. At the time, the Estate had no cash assets, only the claim to title to real property. Moreover, it was admittedly difficult to prepare such valuation opinions, because of the complex set of transactions before the court that purported to establish different beneficial interests in the land trusts and the business trusts and alternately, the real property. Those transactions had to be unwound before the issue of the property value could easily be addressed, even by an owner of property, whoever that was. (Evid.Code, § 813, subd. (a)(2) [an owner of property can give opinions as to its value]; see 1 Witkin, Cal. Evidence (4th ed. 2000) Opinion Evid., § 98 et seq., pp. 646-662.) This set of circumstances amounted to good cause to reopen the matter for further evidence of property value.
In any case, when we analyze this statutory scheme, we must take into account its evident purpose, to effectuate the intent of the decedent and to prevent looting of estates. Here, considerations of judicial economy support treating a request for double damages like a request for punitive damages, in which the damages phase need not be processed unless there is an underlying finding of liability. Without an immediate need to evaluate the property that was to be returned to the proper owner, the Estate, but only if it prevailed, it would have been risky for the Estate to incur the expenses of obtaining appraisals. Although the trial court was concerned that the Estate could be allowed a "second bite at the apple," if the proceedings were reopened on property value, there is no procedural unfairness in requiring further proceedings to establish the value of the real property, since that issue was never reached before, and since an accounting is still anticipated to occur upon finality of this liability portion of the litigation. The accounting will presumably be helpful in establishing the value of the real property, because it will address whether the property had income and expenses that shed light upon its value at the relevant time periods.
For all of these reasons, we determine that the trial court erred in its statutory interpretation that an element of the Estate's claim under section 859 was proof of value of the subject real estate at the liability phase of adjudicating the petition. Rather, the more appropriate approach was to determine the merits of the petition to reestablish title to the real property in the Estate, and then to defer the valuation process until the accounting phase of the proceedings; it is not possible to double an amount without knowing what it is. Further, double damages are punitive in nature, or a "species" of punitive damages, and therefore section 859 should be read to allow these issues to be addressed separately. At all times, bifurcation and the order of proof remain in the discretion of the trial court, and we express no opinion on whether these issues could sometimes be tried together, upon an appropriate case. We decide only that under the circumstances of this case, the trial court should have allowed the evidence to be reopened for the purpose of valuing the property and then setting a double damages amount under section 859, since the remainder of the requirements for such damages had previously been established.

*544 DISPOSITION
The judgment is reversed for further proceedings consistent with the views herein expressed, and the trial court is directed to modify the judgment to permit appropriate proceedings to establish the value of the real property taken, for the purpose of calculating double damages for which liability was previously established; such further proceedings shall also resolve the bankruptcy discharge issues as to Evans individually, and shall be held in conjunction with the previously ordered accounting. In all other respects, the judgment is affirmed. Objectors to pay all costs on appeal.
WE CONCUR: McCONNELL, P.J., and O'ROURKE, J.
NOTES
[1] All further statutory references are to the Probate Code unless noted.
[2] The judgment is appealable under section 1300, subdivision (k). The parties concur that the judgment is final in nature, despite the anticipated further accounting to be completed after this challenge to the liability portions has been brought to finality.
[3] Pending appeal, Objector Evans brought a motion to dismiss the cross-appeal, which we will address in part IIIA, post.
[4] "A discussion of Land Trusts appearing in University of Illinois Law Forum (1955) page 655, says that the land trust is an Illinois institution, and sets forth [citation] a standard form.... Indeed, the trust instruments here under consideration were executed upon printed forms with the blanks filled in." (In re Tutules' Estate (1962) 204 Cal.App.2d 481, 483-484, 22 Cal.Rptr. 427.) This "land trust" concept is not referenced in Miller & Starr, California Real Estate, except generally as follows: "An express trust may only be created by a written document. A trust can be created in real property by either a written document signed by the owner and declaring the owner as trustee or by transferring the property to another as trustee for the benefit of designated persons. Title may also be conveyed to a trust that is a separate legal entity formed to hold title to assets for the benefit of designated beneficiaries. [¶] ... [¶] When property is transferred to a trustee in trust, the legal title to the trust property is vested in the trustee, subject only to the execution of the trust. The beneficiary does not have any legal estate in the property, but only has the right to enforce performance of the trust according to the terms of the trust instrument." (3 Miller & Starr, Cal. Practice Guide (3d. ed.2000) § 8:33, pp. 62-63; fns. omitted.)
[5] A certificate holder of a trust creates a certification of trust and may present it to establish the existence or terms of the trust, in lieu of providing a copy of the trust instrument. This procedure is meant to ensure accuracy of the trust contents. (§ 18100.5; 13 Witkin, Summary of Cal. Law (10th ed. 2005) Trusts, § 256, pp. 833-835.)
[6] BVH through Charles, later operated a nursery on this same property after the lease expired. It was sued by a Mr. Sparber who was an employee who fell off a greenhouse, and some of Evans's testimony from that action was read into this record.
[7] Before oral argument, Objector Evans filed a motion seeking to have this court dismiss the. cross-appeal as to him, based on the pleadings and records in his personal bankruptcy case (In re Robert Richard Evans, Debtor (U.S.Bank.Ct., S.D.Cal, 20.05, No. 05-07441-JM7)). At oral argument, counsel for the Estate did not object to such a dismissal as to Evans individually, and it is granted. However, with respect to the further proceedings that will occur upon remand, we express no opinion as to the extent of Evans's remaining obligations to participate as trustee of Objector IVM, and leave that issue to the trial court to resolve.
[8] Objectors argue that the Estate's reference to Objectors' own motion to bifurcate punitive damages should not be argued on appeal as giving rise to a right to bifurcation as to the Estate. Objectors argue that a party is normally not permitted "to change [his/her] position and adopt a new and different theory on appeal" because doing so would be unfair both to the court and to the opposing litigant. Exceptions are made when questions of law only are presented on the facts appearing in the record. (Brown v. Boren (1999) 74 Cal. App.4th 1303, 1316, 88 Cal.Rptr.2d 758.) Here, there is no new theory being raised on appeal, but only a particular citation to the existing record for purposes of arguing a point.
[9] Business & Professions Code section 16750, subdivision (a) allows a successful antitrust plaintiff to recover three times the damages sustained by him or her, as well as interest on actual damages, and injunctive relief, along with attorney fees and costs of the suit. In Business and Professions Code section 17082, a successful plaintiff in an unfair competition action may recover three times the amount of the actual damages, if any, sustained by the plaintiff, as well as three times the actual damages, if any, sustained by any person who has assigned to the plaintiff a claim for such damages. Proof of the underlying damages can be made at the same time as the multiplier is applied. Our case is different, because there was no apparent Estate entitlement to the property at the outset of trial, and the Estate had to prove its entitlement to title before it could adequately address the value of its damages claims.