Filed 5/30/24  Marriage of Phipps CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re the Marriage of KENNETH JAMES PHIPPS and JEAN AMBER PHIPPS. | |
| KENNETH JAMES PHIPPS,<br><br>　　　Plaintiff and Appellant,<br>v.<br>JEAN AMBER PHIPPS,<br><br>　　　Defendant and Respondent. | A163407<br><br>(Contra Costa County<br>Super. Ct. No. D89-07997) |

Kenneth James Phipps appeals after the trial court ordered him to sign a qualified domestic relations order (QDRO) enforcing the interest of his former spouse, Jean Amber Phipps (aka Greer), in his defined benefit pension plan.  He also challenges the court's order requiring him to pay "any reasonable costs associated with his bad faith refusal to cooperate with preparation of the QDRO."  Phipps contends the trial court erred by failing to consider equitable defenses of laches and unclean hands, inadequately addressing documentary evidence presented at trial, excluding material evidence, and applying incorrect standards in rejecting his request for sanctions against Greer and imposing costs against him.  We will reverse the court's decision in part as to its determination that Greer was entitled to

1

"costs" for Phipps's "bad faith" conduct because the record demonstrates he was not provided with notice and an opportunity to be heard on the issue of sanctions. In all other respects, we affirm the trial court's decision.

FACTUAL AND PROCEDURAL BACKGROUND

Phipps and Greer were married in September 1978. During the marriage, Phipps was a participant in an employment retirement plan called the "Western State Insulators and Allied Workers' Pension Plan" (hereafter the pension plan).

A. Marital Dissolution Proceedings

In November 1989, Phipps petitioned for dissolution of marriage.

On October 29, 1991, the trial court issued an order memorializing the parties' "Stipulation Resolving Some Community Property Issues" (hereafter the 1991 order). (Boldface and capitalization omitted.) The parties stipulated that Phipps would receive an encumbered 1988 Ford Ranger, a boat, and a "King horse trailer" valued at $1000, while Greer would receive a 1976 Dodge Dart and 1978 Ford Fairmont. This allocation was "deemed equal." Greer was also awarded "[t]he entire marital interest (not just one-half) of [Phipps'] defined benefit pension plan," while Phipps was awarded two individual retirement accounts (IRAs)—an arrangement also "deemed equal." Phipps retained "those portions of his defined benefit pension plan as his separate property except for those portions accrued during the marriage between September 9, 1978, and the date of separation, November 10, 1989, being $351.51 per month." The 1991 order expressly called for a QDRO[1] to be

---

[1]      Under the Employee Retirement Income Security Act of 1974 (29 U.S.C. § 1001 et seq.; ERISA), as amended by the Retirement Equity Act of 1984 (Pub.L.No. 98-397 (Aug. 23, 1984) 98 Stat. 1426), "QDROs are a subset of 'domestic relations orders' ('DROs'); DROs are any orders relating 'to the provision of child support, alimony, or marital property rights to a spouse,

2

"initially prepared by counsel for [Phipps] and approved by counsel for [Greer]."

On March 24, 1992, the parties attended a settlement conference, and their stipulations were set forth on the record as follows. Any personal properties in the parties' possession would be their separate properties, but the marital residence would be awarded to Phipps, subject to existing encumbrances. The horse trailer would also be awarded to Phipps. "[I]n order to equalize the division," Phipps would pay Greer two sums: $13,500 and $500. The couple would follow the recommendations of the Family Court Services as to custody and visitation regarding their two children, and each side would pay its own attorney fees. The issue of child support was expressly reserved.

Following the settlement conference, on April 16, 1992, Phipps's then-attorney, Maurice Moyal, sent a letter to Greer's attorney (hereafter the April 1992 letter) forwarding "my proposed Order from the March 24, 1992

---

former spouse, child, or other dependent of a plan participant . . . made pursuant to a State domestic relations law.' [Citation] A DRO is a QDRO if it 'creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or part of the benefits payable with respect to a participant under an [ERISA] plan,' " and does not require the plan to provide any type of benefit not otherwise provided, provide increased benefits, or require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO. (*Trustees of the Directors Guild of America-Producer Pension Benefits Plans v. Tise* (9th Cir. 2000) 234 F.3d 415, 420 (*Tise*), internal footnote omitted.) A QDRO must also contain specific information regarding the alternate payee and affected plan participant. (*Ibid.*) "The QDRO provision is an exception not only to ERISA's rule against assignment of plan benefits but also to ERISA's broad preemption of state law. [Citation.] State family law can, therefore, create enforceable interests in the proceeds of an ERISA plan, so long as those interests are articulated in accord with the QDRO provision's requirements." (*Tise*, at p. 420.)

Mandatory Settlement Conference for your review." Moyal stated, "Since our clients have agreed upon a payment in the sum of $13,000 [*sic*] plus an additional sum of $500 paid to [Greer] in order to equalize the division of community assets, I will not prepare the [QDRO] for the Defined Benefit Pension Plan previously allocated to [Greer] or either of the two A.L. Williams IRAs allocated to my client as a division of those assets were satisfied with the equalizing payment." A few months later, in September 1992, Moyal informed the trial court that he had not heard back from Greer's attorney regarding the proposed order.

On September 28, 1992, the trial court issued a written order on the parties' stipulations after the March settlement conference (hereafter the 1992 order). The 1992 order stated it was based on "the evidence presented, both oral and documentary," as well as the court's consideration of "the partial stipulation of parties and counsel in open court." The court ordered in pertinent part that each party would retain all furniture, furnishings, and appliances in their possession; Phipps would receive the marital residence, the King horse trailer, a savings plan, and his "Permanent Disability Retirement for back and shoulder"; and Phipps would assume most of the community debts, with the exception of an American Express debt that would go to Greer. Phipps was ordered to pay Greer $13,500 "in order to equalize the division of community assets between the parties." He was further ordered to pay Greer $500 for her "interest in the King horse trailer."

The 1992 order also entered the parties' stipulations regarding custody, visitation, spousal support, and attorney fees and costs. The trial court reserved jurisdiction over the issue of child support.

4

## B. July 2003 Agreement

In July 2003, Phipps and Greer reached an agreement to settle Greer's child support arrears. In a notarized document, dated July 27, 2003 (hereafter the 2003 agreement), Greer agreed that "upon sending this notarized document to [Phipps] and making a lump sum payoff payment of $5,000.00 to the California Child Support office . . . , all possible future obligations between [Phipps] and myself resulting from our marriage are now settled."

## C. Greer's Request for Appointment of Elisor

In October 2019, Phipps wrote to Greer asking her to complete paperwork to finalize his pension. Phipps stated in his letter that "back in 2003 you contacted me in regards to helping you to have your obligation of back-child support released so you and your husband could buy a house. I accepted a reduced payment for the back-child support and requested the State to release you from collection. In return you agreed to release me from all the future obligation from my pension and health care retirement plan." Included with the letter was a blank form for Greer's signature indicating her waiver of any rights to pension benefits earned by her former spouse.

Greer did not complete the waiver form and instead retained legal services to assist her in the preparation of a QDRO. In June 2020, Greer, unrepresented by counsel, filed a request in the trial court for the appointment of an elisor to sign, on Phipps's behalf, a QDRO enforcing her interest in the pension plan. In a supporting declaration, Greer explained that the QDRO was prepared by her attorney pursuant to the 1991 order and was preapproved by the pension plan administrator, but that a court-filed QDRO was required for Greer to receive the pension benefits. Greer further averred that on January 24, 2020, the QDRO was mailed to Phipps for his

signature, but he refused to sign it.  Instead, Phipps contacted the plan administrator and objected to the QDRO on the grounds that Greer was no longer entitled to the benefits.

**D. Phipps's Response**

In September 2020, Phipps filed a responsive declaration claiming that two events " 'undid' " the 1991 order's award of the pension plan to Greer.  First, Phipps claimed that under the 1992 order, his $13,500 payment to Greer was a buyout of her interest in the pension plan, as Greer negotiated this amount because she did not want to wait until Phipps's retirement to receive money under the pension plan.  Second, Phipps asserted that the July 2003 agreement, which stated " 'all possible future obligations . . . resulting from our marriage are now settled' " (boldface omitted) also confirmed that Phipps's interest in the pension plan had been restored, as this was the only future obligation remaining between them.  Finally, Phipps argued that Greer's QDRO request should be denied under the equitable defenses of laches and unclean hands.

In addition to his responsive declaration, Phipps filed a notice of intent to seek sanctions against Greer under Family Code sections 271 and 721.

**E. Trial and Decision**

In advance of trial, Phipps filed a list of trial exhibits that included, among other things, both his and Greer's settlement conference statements for the March 1992 settlement conference (exhibits 4 and 5, respectively), as well as the reporter's transcript of the March 1992 settlement conference (exhibit 8).  Phipps also filed a request for a statement of decision on the following principal controverted issues:  (1) the effect, if any, of the 1991 order; (2) the effect of the 1992 order; (3) the effect of the 2003 agreement; and (4) Phipps's request for sanctions.

The matter came on for trial on two dates in March and May 2021. Phipps was represented by attorney Steven Greenfield. Greer was self-represented.

## 1. *Greer*

Greer testified that the 1992 order did not modify or undo the 1991 order's award of the pension plan to her, and that the $13,500 equalizing payment by Phipps was for "my part of interest to the real estate property we owned, the residential property," not to buy out her interest in the pension plan. Greer denied that during the settlement discussions in 1992, she expressed a desire for immediate cash rather than having to wait to receive the pension plan benefits.[2]

Greer acknowledged a QDRO was not prepared immediately after the 1991 order. But she testified she was not concerned about this because of her "understanding that a QDRO doesn't have an expiration date on it" and "can be filed anytime," either "at the time of retirement or . . . prior to that. [¶] The only requirement is, my understanding, that in order to initiate the benefits the QDRO has to be filed." Regarding the April 1992 letter from Phipps's counsel, Greer testified she was not alarmed about Moyal's statement that he would not prepare a QDRO because she was represented by counsel, and the 1991 order "preserved my right" to the pension benefits.

Greer further testified that the 2003 agreement was not a contract to waive her right to the pension plan benefits so that she could buy a house, but rather, an agreement to settle, once and for all, her child support arrearage. She denied that she had experienced difficulty obtaining

---

[2]     During Greer's testimony, the trial court admitted into evidence the reporter's transcript of the March 1992 settlement conference memorializing the parties' stipulations.

financing to purchase a residence due to the child support arrearage and explained that the reason she contacted Phipps in 2003 was "[be]cause I received a notice from the California state child support division in regards to the arrearage" and was told that "Mr. Phipps called in the note. That's what generated the notice to me." Greer testified she made only one telephone call to Phipps and presented an amount to settle the arrearage, and Phipps called her back a few days later and accepted her agreement to pay him $5,000. Asked if Phipps expressed "concerns about being worried about the pension or health care issues somehow still being alive," Greer responded the only conversation they had concerned the child support arrearage.

Greer understood the 2003 agreement's settlement of "all possible future obligations" to refer to the child support arrearage because that was "[t]he only open end that we had . . . . All properties, assets had already been settled." "[T]here wasn't anything else to discuss with him as far as our business to our marriage went. Everything else had already been settled." Greer denied that the "all possible future obligations" phrase had anything to do with the pension plan, as that award "was already settled even though the QDRO wasn't filed. The QDRO wasn't filed, but it didn't take away my rights that had been preserved."

During her testimony, Greer acknowledged that in Phipps's exhibit 4 settlement conference statement, he claimed that Greer owed him $6,106. But when Phipps requested admission of exhibit 4, the trial court explained it did not "generally admit settlement conference[] statements," and the statement was "what his attorney, Mr. Phipps's attorney, believes to be the issue and the value. How is that relevant?" Phipps's attorney, Greenfield, "agree[d] with the court."

8

### 2. *Phipps*

Phipps testified in relevant part as follows. He began earning service credits for the pension plan in 1980 and earned 8.5 years of credit during the marriage. Between 1985 and 1997, he suffered a setback in his accrual of service credits due to a recurring injury, but he managed to complete his employment towards the pension plan and retired in October 2019.

Phipps testified that discussions regarding community property division were still "fluid" between the March 1992 settlement conference and the 1992 order, and during that time, Greer's attorney "had made it clear" that Greer "wanted cash instead of owing me $6,100," as reflected in the "Propertizer"[3] document attached to Phipps's settlement conference statement (exhibit 4). According to Phipps, "we were going to shift monies around to give her cash . . . . [¶] … so they offered my pension back to me in exchange, since it was still my property, I guess, the way it is set up; and I would give her 13,500, and also shifted the 6,000 over also, giving her a $20,000 to her side." Phipps claimed that these renegotiations "became more urgent" after he reinjured himself in 1992.

Regarding the April 1992 letter, Phipps testified that Moyal's statement that he would not prepare a QDRO confirmed in Phipps's mind that the pension plan benefits had been awarded back to him. Phipps's "understanding after '92 was that I had retained my pension and Ms. Greer had accepted a lot of cash."

Phipps further testified that the pension issue was discussed again in July 2003 because, as he explained to Greer, when he had previously served as the executor of his father's estate, his mother came back after the divorce

---

[3] " 'Propertizer' is commercial software that divides community assets and debts." (*Welch v. Welch* (2022) 79 Cal.App.5th 283, 291, fn. 5.)

to claim his father's pension, which "created a huge amount of trouble for the entire family," and Phipps "didn't want to go through that" with Greer.

During Phipps's testimony, his attorney Greenfield asked the trial court to admit the "Propertizer that's attached to the settlement conference statement" but the court reiterated its "problem . . . with moving in a settlement conference statement, or even the Propertizer that's attached" because those documents simply reflect "the parties' belief or opinion that this is the value of the property. I don't have any expert testimony. Some of these I don't even understand. And I don't know what the parties decided ultimately after their settlement conference." The court noted that the Propertizer attached to Phipps's exhibit 4 listed the value of the marital home, minus encumbrances, as "$27,000 or 13,500 to each party. [¶] But the rest of the things, I don't know what they are. . . . [¶] And so I'm not inclined to let in settlement conference statements or attached Propertizers of what each party's belief of what the items was worth without more." Greenfield responded, "Okay. But the Court has heard testimony about what the parties understood with regard to how they took into consideration the Propertizer I'm referring to." The court responded, "I did."

At the conclusion of Phipps's testimony, Greenfield reiterated Phipps's request for a statement of decision.

### 3. *Greer's Rebuttal Testimony*

Greer again took the stand to provide rebuttal testimony on several exhibits. She began discussing the settlement conference statement (Phipps's exhibit 4), testifying that the marital home had actually been appraised at $158,000, with $90,000 still owing on the mortgage. Greenfield objected on the ground that "the Court has not allowed this into evidence." The court agreed, obtained confirmation from Greenfield that he was "withdrawing that

10

exhibit," and explained to Greer that she "can testify what your belief was without relying on the document."

Greer again testified that the marital home was appraised to have an equity value of $68,000 and "[o]ut of that equity, I was awarded the $13,000. And that was because the house had to be refinanced to get me off the loan. Since he did not want to sell it at that time. [¶] So what my point was that, that $6,106 was included in the rest of the equity that was awarded to Mr. Phipps." Greenfield objected on the ground that there was no evidence of an appraisal. After a further colloquy, the trial court overruled the objection, stating, "I have to make a determination as to what was the intent of the parties just based upon what was written down," and while Phipps contended the $13,500 payment was a buyout of the pension, "I don't have a number. I don't have a value of the pension. And I think what Ms. Greer is saying is it's her interest in the community home. You're right, there is no value; but, it's her testimony that that's what she believed was the purpose of the 13,500. [¶] So I'm going to let that testimony stay that she believed she was receiving that equalization payment for her community interest in the family home."

### 4. *Statement of Decision*

On June 29, 2021, the trial court issued a tentative statement of decision. Phipps filed written objections, arguing that the court's findings were not supported by the evidence and that the court mischaracterized Phipps's arguments. Phipps also challenged the tentative sanctions award against him due to the lack of legal or factual grounds for its imposition and the failure to provide sufficient notice that sanctions could be imposed against him, which was "a due process violation."

On July 16, 2021, the trial court issued its final statement of decision. The court made findings that Phipps "was not credible" and that Greer "was

11

credible" and rejected Phipps' claim that the 1992 order undid the 1991 order's award of the entire pension plan benefits to Greer, as "[t]here is no mention on the record or in writing that [Phipps] and [Greer] re-negotiated the division of [Phipps's] defined pension plan." The court also found Phipps's position regarding the 2003 agreement "incongruent" with his argument that the parties had already renegotiated the pension plan in 1992.

The trial court concluded that the 1991 order awarded the community interest of the pension plan entirely to Greer, and "[t]here is no agreement thereafter specifically modifying the terms of this agreement. Indeed, the agreement reached September 28, 1992 incorporated all agreements reached on October 19, [1991] except that it inadvertently omitted division of [Phipps's] defined pension plan. The broad and unspecific language of the agreement reached by the parties in July of 2003 does not modify the specific agreement reached by the parties in October of 1991."[4]

The trial court ordered that Phipps sign the QDRO, and that if he refused, the clerk of the court was appointed as elisor to sign on his behalf. The court further ordered Phipps "to pay any reasonable costs associated with his bad faith refusal to cooperate with preparation of the QDRO" and denied his request for sanctions against Greer.

This appeal followed.

## DISCUSSION

### A. Appealability

We perceive a threshold issue of appealability. Although an appeal may be taken from a QDRO (see *In re Marriage of Padgett* (2009) 172

---

[4] The statement of decision makes several references to an agreement reached on "October 29, 2021," which we may reasonably infer as references to the 1991 order.

12

Cal.App.4th 830, 838), Phipps filed his notice of appeal prior to the trial court's entry of the QDRO.[5] A statement of decision is generally not appealable, but a reviewing court has discretion to treat it as an appealable order when it is signed and filed and constitutes the trial court's final decision on the merits. (*Marshall v. Webster* (2020) 54 Cal.App.5th 275, 280.) Here, the statement of decision is signed and filed and finally resolves the merits issues raised in this matter by requiring Phipps to sign the QDRO, or alternatively, appointing the court clerk to sign on his behalf. Accordingly, we exercise our discretion to treat the statement of decision as an appealable order.

### B. General Legal Standards

" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness.' " (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).) On review of a judgment based on a statement of decision following a bench trial, we resolve any conflict in the evidence and draw all reasonable inferences in support of the trial court's decision, viewing the evidence in the light most favorable to the prevailing party. (*Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.) "We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." (*Id.* at p. 76.)

"Stipulated judgments are interpreted according to contract principles," and in the absence of extrinsic evidence, interpreting a contract is

---

[5] The QDRO itself is not in the appellate record before us. However, we note that the register of actions shows the September 21, 2021, entry date of the QDRO, and Phipps provides screenshots of the first and last pages of the signed and filed QDRO in his opening brief.

a matter of law subject to de novo review. (*Estate of Jones* (2022) 82 Cal.App.5th 948, 952–953.)

## A. Equitable Defenses

Phipps contends the trial court erred by failing to consider his equitable defenses of laches and unclean hands, which were "plainly applicable," "framed by the trial evidence," and "worthy of consideration and analysis." We reject this claim of error. Because Phipps failed to comply with the procedures of Code of Civil Procedure[6] sections 632 and 634, his objections to the adequacy of the statement of decision are waived, and we may apply the doctrine of implied findings to uphold the court's decision.

Although written findings of fact and conclusions of law are not generally required, a trial court "shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial. . . . The request for a statement of decision shall specify those controverted issues as to which the party is requesting a statement of decision." (§ 632; see Cal. Rules of Court, rule 3.1590.) "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . , it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." (§ 634.) "For the doctrine of implied findings to be disabled on appeal, both steps of the two-step procedure under section 632 and 634 must be followed," and a lack of strict adherence will result in the waiver of objections to the adequacy of a statement of decision. (*Thompson, supra*, 6 Cal.App.5th at p. 983.)

---

[6]     Further unspecified statutory references are to this code.

14

Here, Phipps did not specify the equitable defenses of laches or unclean hands as principal controverted issues in his requests for a statement of decision prior to and near the conclusion of trial, nor did he object to the tentative statement of decision for omitting discussion of these defenses. As such, Phipps's objections to the statement of decision in this regard are waived, and the doctrine of implied findings is applicable to the trial court's decision. (*Thompson*, *supra*, 6 Cal.App.5th at p. 983.) We therefore infer the court's rejection of Phipps's equitable defenses and conclude substantial evidence supports it.

" ' "Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.] ' "The defense of laches requires unreasonable delay plus either acquiescence in the act about which the plaintiff complains or prejudice to the defendant resulting from the delay." ' [Citation.] [¶] Laches is a question of fact for the trial court, but may be decided as a matter of law where . . . the relevant facts are undisputed." ' " (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263.)

Here, Greer's testimony provided substantial evidence supporting the trial court's implied rejection of Phipps's laches defense. Greer testified that she was not concerned about the lack of a QDRO following the 1991 order because she believed she could seek a QDRO at any time, including at the time of Phipps's retirement. The court expressly found Greer to be credible, and we must defer to that credibility finding. (*Estate of Young*, *supra*, 160 Cal.App.4th at p. 76.) Accordingly, Greer's testimony furnished substantial

15

evidence supporting the court's implied finding that Greer did not unreasonably delay in seeking a QDRO.[7]

Phipps's unclean hands defense fares no better. The doctrine of unclean hands "demands that a plaintiff act fairly in the matter for which [she] seeks a remedy. [She] must come into court with clean hands, and keep them clean, or [she] will be denied relief, regardless of the merits of [her] claim." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978.) Whether the doctrine applies is a question of fact (*ibid.*), and that determination is based on consideration of three factors: (1) analogous case law; (2) the nature of the misconduct; and (3) the relationship of the misconduct to the claimed injuries. (*Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060.)

Here, Phipps identifies no misconduct on Greer's part, let alone explains how her misconduct caused him to be harmed, and he cites no analogous case law to support an unclean hands defense in this case. His suggestion that Greer "breached" the 2003 agreement by enforcing her claim to the pension plan benefits is undermined by the trial court's finding that the 2003 agreement did not modify Greer's interest in the pension plan under the 1991 order. Likewise, his suggestion that Greer was unjustly "enriched" under the 1992 order is untenable, as the court found that the $13,500 payment was meant to equalize the distribution of the marital home to Phipps. At bottom, Phipps's complaint is that the prior settlement

---

[7]     Phipps has cited no authority (either on appeal or in the proceedings below) that compelled the trial court to conclude Greer's QDRO was untimely as a matter of law. (See *Tise, supra*, 234 F.3d at pp. 423–426 [state court DRO obtained before plan participant's preretirement death created enforceable interest in pension benefits even though alternate payee (former spouse) did not qualify DRO as QDRO prior to participant's death].)

16

proceedings and negotiations have all been overwhelmingly in Greer's favor, which even if true, does not state a cognizable defense of unclean hands in the absence of misconduct by Greer. Accordingly, the trial court did not err in impliedly rejecting Phipps's unclean hands defense.

## B. The Trial Court's Purported Failure to "Adequately" Analyze the Documentary Evidence

Phipps contends the trial court failed to "adequately" address the effect of various documents admitted into evidence at trial, made findings that were "contrary to the documentary evidence," and "engaged in speculation about what happened in the past contrary to the evidence—thereby giving no effect to the actual documented history of the case." We construe these points to be contentions that the court's findings were unsupported by substantial evidence.[8] So construed, we reject the contentions for the reasons discussed below.

### 1. *The 2003 Agreement*

Phipps argues the trial court "[f]ailed to adequately address the effect of" the 2003 agreement because the contract "speaks for itself in that the child support compromise meant 'all possible future obligations between . . . Phipps and [Greer] resulting from our marriage are now settled." Phipps maintains the words "all possible future obligations" necessarily covers "the possible obligation of a pension, which was in fact some 16 years in the future." We find no reversible error.

---

[8] To the extent Phipps merely disagrees with the trial court's resolution of factual disputes in the evidence, this is insufficient to show reversible error on appeal. The law requires that we view the evidence in a light most favorable to Greer and defer to the court's resolution of disputed facts supported by substantial evidence. (*Estate of Young, supra,* 160 Cal.App.4th at pp. 75–76.)

17

In construing a contract, "a court generally looks to 'objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.]' [Citation.] 'Contract law being a question of objective manifestation of intent, the courts should treat a document as what it says it is unless extrinsic evidence supplies notice of ambiguities . . . .' [Citation.] [¶] When a trial court's construction of a written agreement is challenged on appeal, the scope and standard of review depend on whether the trial judge admitted conflicting extrinsic evidence to resolve any ambiguity or uncertainty in the contract. If extrinsic evidence was admitted, and if that evidence was in conflict, then we apply the substantial evidence rule to the factual findings made by the trial court." (*De Anza Enters. v. Johnson* (2002) 104 Cal.App.4th 1307, 1315 (italics omitted).)

Here, there was extrinsic evidence of the parties' intent in executing the 2003 agreement. Greer testified she called Phipps in 2003 to settle the issue of child support arrears after receiving notice from a child support agency that Phipps intended to seek collection. Asked about her intent regarding the "all possible future obligations" phrase, Greer testified she understood this language to pertain to the issue of child support, which was the last unresolved issue between them. She flatly denied that the phrase had anything to do with the pension plan, as that issue "had already been settled in court." Greer's testimony provided substantial evidence supporting the trial court's finding that the 2003 agreement did not modify the 1992 stipulation's award of the pension plan benefits to Greer.

18

We reject Phipps's contention that the plain language of the 2003 agreement compels a contrary finding. The 2003 agreement did not mention Greer's interest in the pension plan, and its reference to "all possible future obligations" is plausibly construed as pertaining to obligations that had not already been settled. The issue of pension benefits, however, had long been settled under the 1991 order.

## 2. *The $13,500 Equalizing Payment*

Phipps contends the trial court "[m]issed an obvious fallacy" in finding that the $13,500 payment was intended to equalize the distribution of the marital home. Phipps maintains the payment could not possibly have been for that purpose because by Greer's own testimony, the net equity in the marital home was $68,000, entitling her to $34,000, not $13,500. We again are not persuaded.

True, the trial court heard testimony on two different equity values for the marital home—$27,000 according to Phipps, and $68,000 according to Greer—but the precise net equity value of the home was not the material issue. Rather, the issue was the parties' intent in stipulating to the terms that became the 1992 order, and on that score, several factors supported the court's finding that the $13,500 payment was intended to equalize the distribution of the marital home. According to the reporter's transcript of the March 1992 settlement conference, the stated purpose of the $13,500 payment was "to equalize the division," and this was expressed immediately after the parties memorialized their agreement that Phipps would receive the marital home. There was no mention of renegotiating the pension plan award. Likewise, the 1992 order did not mention the pension plan, and it stated the $13,500 payment was "to equalize the division of community assets" after listing various asset distributions, including the award of the

19

marital home to Phipps. Meanwhile, Greer squarely testified that the $13,500 payment was for her interest in the marital home, and we assume the court credited her testimony in this regard. Finally, Phipps does not attempt to explain how, if indeed the $13,500 payment was a buyout of Greer's interest in the pension plan, he could be awarded the marital home without having to make any equalizing payment of the net equity to Greer. Viewing the evidence in a light most favorable to the trial court's decision, and giving it the benefit of every reasonable inference (*Estate of Young*, *supra*, 160 Cal.App.4th at pp. 75–76), we conclude substantial evidence reasonably supported the court's finding that the $13,500 payment was to equalize the distribution of the marital home, and not to buy out Greer's interest in the community portion of the pension plan.

Phipps next contends the trial court's "most glaring and consequential" error was in "mistakenly recit[ing] the *written* Order of September 28, 1992 as being at the judicially supervised settlement conference—which had actually taken place 5 months earlier, on March 24th." Phipps maintains this error was consequential because the court ignored key events following the settlement conference that revealed Greer's true intent in accepting the $13,500 equalizing payment. These events were: (1) Phipps's reinjury in 1992, which resulted in his permanent disability and purportedly motivated Greer to want "cash up front instead" of her right to uncertain pension benefits; and (2) in April 1992, Phipps's then-attorney, Moyal, sent a letter to Greer's counsel "explaining why the QDRO was not prepared," which confirmed that the parties had renegotiated Greer's right to the pension plan. We again are unconvinced.

Even if the trial court mistakenly conflated the dates of the settlement conference and the entry of the 1992 order, we will not broadly assume the

20

court ignored interim events in reaching its decision. (See *Thompson, supra*, 6 Cal.App.5th at p. 981 [lower court order is presumed to be correct on appeal and all intendments and presumptions are indulged in favor of its correctness].) Rather, we may reasonably assume the court credited Greer's testimony that at no time during the parties' discussions between the March 1992 settlement conference and the 1992 order did she express any desire to have cash up front rather than wait to receive the pension plan benefits. This, combined with the lack of any mention of the pension benefits in the 1992 order, supported the trial court's conclusion that the $13,500 payment did not serve to buy out Greer's interest in the community portion of the pension plan.

Likewise, we decline to infer from the trial court's conflation of dates that it ignored the April 1992 letter. Rather, we may reasonably assume the court considered that letter in rejecting the merits of Phipps's argument, and, viewing the evidence in a light most favorable to Greer, we find no error in the court's decision. Although the April 1992 letter suggested the QDRO was rendered moot by the $13,500 payment, this was simply Moyal's belief; it was not conclusive evidence of the parties' agreement. Meanwhile, the court could still reasonably rely on the fact that neither the transcript of the March 1992 settlement conference nor the 1992 order made any mention of the pension plan in order to conclude the April 1992 letter did not accurately reflect an understanding that the $13,500 payment was to buy out Greer's interest in the community portion of the pension plan.

### C. Propertizer

Phipps contends the trial court erred in refusing to admit the Propertizer attached to Phipps's settlement conference statement (trial

exhibit 4) despite both parties laying the foundation for it and testifying as to their reliance upon it at the March 1992 settlement conference.

We begin by observing that from our view of the record, it appears the trial court did not formally exclude the Propertizer document. Rather, Phipps's attorney Greenfield *agreed* with the court that it was inappropriate for the settlement conference statements to come into evidence and then *withdrew* them as exhibits. True, Greenfield did so only after the court expressed misgivings about admitting the exhibits, explaining that it did not generally allow such statements into evidence and questioning the relevance of the views of the parties' attorneys (as opposed to the views of experts) on the value of the marital home. But even if this amounted to a de facto exclusionary ruling, Phipps provides no argument on appeal to demonstrate that the court's decision, based on its stated concerns about privilege and relevance, exceeded the bounds of reason or transgressed the confines of the applicable principles of law. (*Coastside Fishing Club v. California Fish & Game Com.* (2013) 215 Cal.App.4th 397, 428 [rulings on admissibility of evidence reviewed for abuse of discretion] (*Coastside*).)

Moreover, Phipps fails to demonstrate any assumed error was prejudicial, "i.e., that it is reasonably probable [he] would have obtained a more favorable result absent the error." (*Coastside, supra*, 215 Cal.App.4th at p. 428.) As recounted above, the trial court permitted the parties to testify as to what they "understood with regard to how they took into consideration the Propertizer." Moreover, Phipps's main point is that the Propertizer would have shown that during settlement negotiations in 1992, he claimed Greer owed him $6,106. However, this fact already came into evidence during Phipps's and Greer's testimony. It also bears mentioning that the Propertizer's valuation of the net equity in the marital home ($27,000) was

22

exactly twice the amount of the equalizing payment the parties agreed upon in 1992. Thus, if anything, the exhibit supported the trial court's finding that the $13,500 payment was to equalize the distribution of the marital home. On this record, Phipps fails to demonstrate a reasonable probability that he would have obtained a more favorable result had the Propertizer itself come into evidence.

### D. Denial of Phipps's Sanctions Request and Order to Pay Greer's "Costs"

Phipps contends the trial court erred in denying his request for sanctions against Greer under Family Code sections 271, 721, and 1101, as the court's decision was based on Greer's status as the prevailing party, but none of the statutes Phipps cited in support of his request has a prevailing party requirement. We may quickly dispose of this argument. By finding in favor of Greer on her interpretations of the 1992 order and 2003 agreement, the court impliedly found that Greer did not engage in any misconduct or breaches of fiduciary duty that would support an award of sanctions under the cited statutes. (See Fam. Code, §§ 271 [sanctions for frustrating policy to promote settlement and reduce litigation costs], 721, subd. (b) [fiduciary obligations of spouses], 1101 [spousal claim for breach of fiduciary duty].)

Phipps next contends the trial court erred in ordering him to pay Greer's costs because the court did not provide supporting authority, and because he promptly signed the QDRO after the issuance of the statement of decision. As to the latter point, we fail to see how Phipps's execution of the QDRO *following* the court's decision has any bearing on whether costs were properly imposed against him for his pretrial conduct and lack of success at trial. As to the former point, the mere absence of a statutory citation for a cost ruling is not dispositive, as we may affirm the decision on any ground

supported by the record. (*In re Marriage of Corona* (2009) 172 Cal.App.4th 1205, 1224–1225.)

In general, the prevailing party "in any action or proceeding" is entitled as a matter of right to recover their litigation costs. (§ 1032, subd. (b).) Here however, the trial court's award of "any reasonable costs associated with [Phipps's] bad faith refusal to cooperate with preparation of the QDRO" is not reasonably construed as a general award of litigation costs, as it is expressly premised on Phipps's "bad faith" conduct and applies broadly to "any" costs "associated with" his refusal to cooperate in the QDRO process. Instead, we construe the award as a sanction imposed on Phipps under any number of possible statutes, including section 128.5 (sanctions for bad faith actions or tactics that are frivolous or solely intended to cause unnecessary delay), section 128.7 (sanctions for filing documents for improper purpose, harassment, increasing litigation costs), and/or Family Code section 271 (sanctions for conduct that frustrates policy of promoting settlement and reducing litigation costs). (See *In re Marriage of Corona*, *supra*, 172 Cal.App.4th at pp. 1224–1225 [order finding party's actions " 'unreasonable' " and "in 'bad faith' " suggested application of sections 128.5 or 128.7].)

Critically, although the statement of decision refers only to "costs," recoverable costs may include attorney fees where authorized by contract, statute, or law (§ 1033.5, subd. (a)(10)), and the above statutes expressly provide for the award of attorney fees as sanctions (§ 128.5, subd. (a), § 128.7, subd. (d), Fam. Code, § 271, subd. (a)). While Greer was not entitled to attorney fees for her own work as a self-represented litigant (see *Musaelian v. Adams* (2009) 45 Cal.4th 512, 515; *Trope v. Katz* (1995) 11 Cal.4th 274, 285; *In re Marriage of Erndt & Terhorst* (2021) 59 Cal.App.5th 898, 904–905), the record discloses that she obtained legal services to assist her in the

24

preparation of a QDRO.  It is possible, then, that under the trial court's sanctions ruling, Greer may seek to be compensated for any attorney fees she incurred.

As such, it was critical to provide Phipps notice and an opportunity to be heard before the trial court determined Greer's entitlement to sanctions. " '[N]otice prior [to] imposition of sanctions is mandated not only by statute but also by the due process clauses of both state and federal Constitutions.' " (*In re Marriage of Duris & Urbany* (2011) 193 Cal.App.4th 510, 513 (*Duris & Urbany*) [reversing award of attorney fees for lack of prior notice].)  " '[C]ase authority condemns imposition of sanctions without prior notice.' " (*Ibid*.)

All of the statutes cited above expressly require that the person, party, or attorney subject to a sanctions request be given notice and an opportunity to be heard, among other protections.  Section 128.5 provides that sanctions "shall not be imposed except on notice contained in a party's moving or responding papers or, on the court's own motion, after notice and opportunity to be heard.  An order imposing expenses shall be in writing and shall recite in detail the action or tactic or circumstances justifying the order." (§ 128.5, subd. (c).)  Section 128.7 likewise requires "notice and a reasonable opportunity to respond" as well as the court's description of the sanctionable conduct and explanation of the basis for the sanction imposed.  (§ 128.7, subds. (c), (e).)  Section 128.7 additionally requires the sanctions request to be made in a separate motion that must be served 21 days before the motion is filed with the court in order to provide a "safe harbor" period in which the offending filing may be corrected or withdrawn without penalty.  (§ 128.7, subd. (c)(1).)  Family Code section 271, too, provides that "[a]n award of attorney's fees and costs as a sanction pursuant to this section shall be imposed only after notice by the requesting party or the court to the party

25

against whom the sanction is proposed and opportunity for that party to be heard is provided by the court." (Fam. Code, § 271, subd. (b).)

Here, Phipps did not have fair warning that sanctions could be imposed against him. Greer did not request attorney fees or costs against him either in her request for appointment of an elisor to sign the QDRO or during the trial. At the conclusion of the evidentiary portion of trial, the trial court scheduled the matter for closing arguments without any mention of the possibility of imposing sanctions. Even assuming the issue of sanctions was first raised by Greer or the trial court during closing arguments,[9] this would not comport with the requirements of due process. (See *Duris & Urbany*, *supra*, 193 Cal.App.4th at pp. 513–514 [raising sanctions for first time during closing arguments after evidentiary hearing was complete was insufficient notice for purposes of awarding sanctions under Fam. Code, § 271]; *Lesser v. Huntington Harbor Corp.* (1985) 173 Cal.App.3d 922, 933 [two days' notice for sanctions hearing was insufficient time to prepare declarations showing litigation was filed in good faith].)

For these reasons, we reverse the portion of the trial court's decision finding that Greer is entitled to her "costs" for Phipps's "bad faith" conduct— which we construe to be a determination of Greer's entitlement to sanctions— and remand for further proceedings consistent with this opinion. If the trial court wishes to impose sanctions on Phipps, it shall provide him with all protections to which he is entitled under applicable law, including notice and an opportunity to be heard.

---

[9] The record on appeal does not include the reporter's transcript of the final day of trial during which closing arguments were made.

## DISPOSITION

The trial court's decision is reversed in part as to its determination that Greer is entitled to "costs" for Phipps's "bad faith" conduct and remanded for further proceedings consistent with this opinion. In all other respects, the court's decision is affirmed. In the interests of justice, each side shall bear its own costs on appeal.

_____

Fujisaki, J.

WE CONCUR:

_____

Tucher, P. J.

_____

Petrou, J.

*Phipps v. Greer* (A163407)

27